Crim. No. 6396. Fourth Dist., Div. Two. Dec. 18, 1974.]

THE PEOPLE, Plaintiff and Respondent, v.
PETER CUMMINGS, Defendant and Appellant.

**COUNSEL**

Ron Minken and Leonard C. Kohn for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, A.

Wells Petersen and Harley D. Mayfield, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**THE COURT:**\*—Defendant was charged by information with possession of marijuana for sale (Health & Saf. Code, § 11359) and transportation of marijuana (Health & Saf. Code, § 11360).

Defendant personally waived jury trial, was advised of and waived related constitutional rights and stipulated to submission of the case on the transcript of the preliminary examination. He was found guilty as to each count.

Imposition of sentence was suspended and defendant was granted probation for three years.

## FACTS

At approximately 8:35 p.m. on September 5, 1973, defendant, driving a 1968 Cadillac with Nevada plates, approached the permanent Border Patrol checkpoint about one mile south of Temecula (on Highway 395) and 70 miles north of the United States-Mexican border (hereinafter referred to as Temecula checkpoint).

At the checkpoint defendant was directed to pull off the road for a secondary inspection. Agent Abreu conducted the secondary inspection, the primary inspection having consisted of observation of defendant and his vehicle as it pulled up to the checkpoint. Agent Abreu asked defendant where he was born and received a reply that he was born in the United States. The agent then asked defendant to open his trunk for a routine immigration inspection, and defendant did so. The reason the agent asked defendant to open the trunk was because of past experience that aliens were smuggled in that manner. Abreu had himself found aliens in car trunks 30 to 50 times.

---

\*Before Gardner, P. J., Kaufman, J., and Whyte, J.†

†Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

When defendant opened the trunk, Abreu observed a sleeping bag spread out over the trunk and noticed a flour sack with Mexican writing on it in the corner. He moved closer and smelled what he thought was the odor of marijuana. He examined the flour sack and found it contained marijuana, then lifted the sleeping bag and found a grocery bag containing more marijuana. It was stipulated the items discovered by Abreu consisted of approximately 13 kilograms of marijuana.

The sole issue on appeal concerns the constitutionality of the Border Patrol checkpoint at Temecula. Defendant relies on *Almeida-Sanchez* v. *United States,* 413 U.S. 266 [37 L.Ed.2d 596, 93 S.Ct. 2535] for the proposition that Border Patrol searches at permanent checkpoints are unconstitutional. Defendant *does not contend* that even if the stop and search for illegal aliens was proper, the actual discovery of the marijuana was unlawful.

In *Almeida-Sanchez* the defendant's vehicle was stopped by a "roving patrol" of the Border Patrol and a search conducted revealed marijuana. There was neither probable cause for the stop nor the search and, of course, no warrant. The stop was made on State Highway 78 in California at a point approximately 25 air miles north of the Mexican border. Highway 78 does not reach the Mexican border and at all points lies north of Interstate 80, a major east-west highway which is entirely within the United States.

The government unsuccessfully relied on the provisions of 8 United States Code, section 1357, and the Attorney General's regulations which define a reasonable distance as within 100 air miles from any external boundary of the United States.[1] The court reversed the defendant's conviction which had been affirmed by the Ninth Circuit. The court observed that the Border Patrol conducted three types of surveillance along inland roadways, to wit: (1) permanent checkpoints; (2) temporary checkpoints; and (3) roving patrols.

[1] 8 United States Code, section 1357(a), provides in pertinent part:
"Any officer or employee of the Service authorized under regulations prescribed by the Attorney General shall have power without warrant—
"(1) to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States; ...
"(3) within a reasonable distance from any external boundary of the United States, to board and search for aliens any vessel within the territorial waters of the United States and any railway car, aircraft, conveyance, or vehicle . . . ."
8 Code of Federal Regulations, section 287.1, provides in pertinent part:
"(a) (2) *Reasonable distance.* The term 'reasonable distance,' as used in section 287 (a) (3) of the Act, means within 100 air miles from any external boundary of the United States or any shorter distance which may be fixed by the district director, or, so far as the power to board and search aircraft is concerned, any distance fixed pursuant to paragraph (b) of this section."

The court held in *Almeida-Sanchez* that the Border Patrol must have either a warrant or probable cause when a roving patrol of the Border Patrol stops and searches a vehicle. Mr. Justice Powell in his concurring opinion suggests that roving patrols may still be allowed to operate by obtaining in advance an "area" warrant based upon a sufficient showing. This would eliminate the need of having specific information as to a particular vehicle.

As to checkpoints, we find the following language in *Almeida-Sanchez*: "Whatever the permissible scope of intrusiveness of a routine border search might be, searches of this kind may in certain circumstances take place not only at the border itself, but at its functional equivalents as well. For example, searches at an established station near the border, at a point marking the confluence of two or more roads that extend from the border, might be functional equivalents of border searches." The court reasonably suggests that established stations meeting this definition may stop passing vehicles and search for aliens without a warrant or probable cause. (Cf. fn. 5 of the opinion.)[2]

The concurring opinion of Mr. Justice Powell in *Almeida-Sanchez* further clarifies its limited scope. He states: "The search here involved was carried out as a part of a roving search of automobiles in an area generally proximate to the Mexican border. It was not a border search, nor can it fairly be said to have been a search conducted at the 'functional equivalent' of the border. Nor does this case involve the constitutional propriety of searches at permanent or temporary checkpoints removed from the border or its functional equivalent. Nor, finally, was the search based on cause in the ordinary sense of specific knowledge concerning an automobile or its passengers. [Fn. omitted.] The question posed, rather, is whether and under what circumstances the Border Patrol may lawfully conduct roving searches of automobiles in areas not far removed from the border for the purpose of apprehending aliens illegally entering or in the country."

In *United States* v. *Bowen* (1974) 500 F.2d 960, the Circuit Court of Appeals for the Ninth Circuit in a seven to six decision held that the rule of *Almeida-Sanchez* applies to permanent checkpoints. However, a

---

[2]The extent of a routine border search is far beyond the scope of a checkpoint search. At the border, to prevent smuggling, extensive searches are permissible extending even to body cavity searches in some situations. In contrast, the checkpoint search has been limited to alien searches thus limiting the scope of permissible areas into which an agent may intrude. Any search at a checkpoint beyond looking into areas where an alien might hide requires a warrant or probable cause. Thus, it is somewhat misleading to talk of checkpoint searches in the terms of a search at the "functional equivalent" of a border.

petition for writ of certiorari has been granted by the United States Supreme Court in that case. (No. 73-6848.)

We deem it appropriate to quote at length from the dissenting opinion in *Bowen* authored by Judge Wallace which we find more persuasive than the opinion of the majority: "With one fell swoop, the majority . . . hews down a law enforcement procedure used for 44 years to curtail the ever-increasing tidal wave of illegal aliens. The use of fixed checkpoints has been neither secret nor clandestine. The procedure has come before our court on numerous occasions [fn. omitted] with no hint that the practice was constitutionally infirm. For us to reverse ourselves at this late date requires clear and convincing reasons. [Citation omitted.] I fail to see them in the majority decision. The only apparent change is the opinion, or better said opinions, in *Almeida-Sanchez v. United States*, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973). A careful analysis, therefore, is required to see if that case dictates our reversal of a long-standing and accepted police practice. [¶] The majority concedes that *Almeida-Sanchez* is a case involving stops and searches by roving border patrol officers. But by some mystic bridging, it holds that *Almeida-Sanchez* also requires that we outlaw searches at fixed checkpoints. The Opinion of the Court was delivered by Justice Stewart and concurred in by Justices Douglas, Brennan and Marshall. That opinion becomes the majority only with the added vote of Justice Powell. . . . Justice Powell's concurrence, therefore, adds a fifth Justice, and thus a majority, only to that part of the Justice Stewart opinion which invalidates the type of search 'conducted in [that] case'—a roving patrol search. [Footnote omitted.] [¶] This critical distinction is brought into even closer focus by Justice Powell's demarcation of the four areas where searches typically occur: . . . Thus, one could infer from his statement that searches can constitutionally occur at (1) the border, (2) functional equivalents of the border, (3) permanent checkpoints and (4) temporary checkpoints. He emphasized that the search in question did not occur in any of the four categories. His concurrence, therefore, cannot be said to give any weight to projecting *Almeida-Sanchez* to cover searches for aliens at fixed checkpoints. He specifically and emphatically limited his concurrence to answering the question of 'whether and under what circumstances the Border Patrol may lawfully conduct roving searches of automobiles in areas not far removed from the border for the purpose of apprehending aliens illegally entering or in the country.' 413 U.S. at 276 [37 L.Ed.2d at 604]. . . . [¶] Ignoring the significance of Justice Powell's limited concurrence, the majority relies basically upon the language quoted by Justice Stewart from *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), and contends that that

language demonstrates that *Almeida-Sanchez* also controls the question of searches at fixed checkpoints. However, here the majority falls into the trap of failing to realize that Justice Powell's concurrence does not necessarily make the language in the Justice Stewart opinion a pronouncement by a majority of the Court. [¶] Because of the close fragmented vote and because Justice Stewart's opinion must be limited in application to roving patrols, great insight can be secured from the dissenting opinion of Justice White in which the Chief Justice and Justices Blackmun and Rehnquist concurred. Justice White, after noting that the Court in *Carroll* v. *United States,* 267 U.S. at 154 [69 L.Ed. at 551-552], recognized that neither a warrant nor probable cause is required to stop and search at the borders, stated this right was undisputed in *Almeida-Sanchez.* He also, with the concurrence of the three other Justices, concluded: 'Neither, apparently, is it disputed that warrantless searches for aliens without probable cause may be made at fixed checkpoints away from the border.' 413 U.S. at 288 [37 L.Ed.2d at 611-612]. Thus, four Justices have specifically taken a position diametrically opposed to that adopted by the majority in this case. As Justice Powell has limited his opinion to the facts of the roving search, we are left to speculate as to his approach to the fixed checkpoint issue. [Fn. omitted.] Suffice it to say that based on the *Almeida-Sanchez* opinions, four Justices have concluded that searches for aliens at fixed checkpoints are not constitutionally infirm and that there is no majority consensus to the contrary. I, therefore, fail to see how the majority in this case can draw comfort from the *Almeida-Sanchez* decision. . . . [¶] What test does the majority apply to determine whether a fixed checkpoint meets the strictures of the Fourth Amendment? [¶] It says that the government cannot justify searches made at fixed checkpoints without a warrant or probable cause on the basis of 8 U.S.C. § 1357(a) (3) and 8 C.F.R. § 287.1(a) (2) because the statute and regulation were vitiated in *Almeida-Sanchez.* But, once again, the majority fails to realize that the Justice Powell concurrence limits the Opinion of the Court so that it cannot be construed to apply to fixed checkpoints. But even if one ignores the significance of Justice Powell's concurrence, Justice Stewart did not state that 8 U.S.C. § 1357(a) and the regulations issued pursuant to it were unconstitutional on their face, but merely that the statute could not vindicate a search that is otherwise in violation of the Fourth Amendment. Consequently, when the majority invalidates searches at fixed checkpoints simply because they too are conducted pursuant to 8 U.S.C. § 1357(a) without independent consideration of whether such searches are reasonable under the Fourth Amendment, they bridge a gap with oversight rather than sound legal reasoning. . . . [¶] Stops and searches similar to the one objected to by Bowen occur not infrequently

and, in many instances, are necessary facets of our way of life. The complexity of our society requires such limited intrusions in order to protect the rights of the majority. [Fn. omitted.] In these specific areas, as long as the stops and searches are limited in their scope to a proper objective and are not unreasonable, they satisfy the Fourth Amendment. . . . [¶] I would not restrict the constitutional test in this fact situation as does the majority but would determine whether the search at this fixed checkpoint was unreasonable under the Fourth Amendment. The majority holds that: The opinion in *Almeida-Sanchez*, delivered by Mr. Justice Stewart, leaves little doubt that traditional Fourth Amendment standards apply to fixed-checkpoint searches as well as to roving-patrol searches. (Fn. omitted.) But there is a majority holding only on the issue of roving patrols. There is a vast difference between a red-light, midnight stop on a lonely road and approaching a well-lighted, fixed checkpoint with warning signs and uniformed men plainly visible. [Fn. omitted.] The majority's assumption that five of the Justices have or would apply the same standard in both is one I cannot accept. [¶] Under the correct test, whether the search at this fixed checkpoint was unreasonable should be determined in the first instance by the trial court after hearing all of the evidence. Such a determination is primarily factual. In applying this test the trial court would balance the rights of the individual vehicle driver against the interests of all the people of the country in stemming an avalanche of persons illegally crossing our borders. [Fn. omitted.] Both Justices Powell [fn. omitted] and White [fn. omitted] refer to the Herculean challenges faced by those directed to prevent illegal entries. Before we direct the Dutch boy to remove his finger from the dike, we owe it to the American people at least to balance their interests against the interests of the individual in being free from this limited intrusion. [¶] While no one can give an accurate count, it has been estimated that there are approximately 800,000 to over 1 million illegal aliens in our country; approximately 85% of these are citizens of Mexico. *United States* v. *Baca,* 368 F.Supp. at 402. The major problem is the abortive attempt to guard 2,000 miles of border with Mexico from the Gulf of Mexico to the Pacific coast. [¶] In addition to aliens entering illegally, 91 million aliens entered the United States legally during the fiscal year 1972, with over 39 million of these entering directly into Southern California. *Id.* at 404. A large percentage of these visitors enter with temporary border passes, restricting them to a seventy-two hour stay and to travel within twenty-five miles from the border. *Id.* at 404; see 8 C.F.R. § 212.6. To enforce these restrictions, some type of investigation away from the border is required. The majority suggests that this flow of illegal aliens can be sufficiently regulated by alternative methods. But I suggest that we do not have

sufficient information in this record to make that determination. Indications are that anything short of an Iron Curtain type border patrol would be ineffective in curtailing the number of illegal entries. *United States v. Baca,* 368 F.Supp. at 405. Further, even stopping the illegal flow across the border would not halt those legally entering but illegally travelling more than twenty-five miles from the border. Therefore, while I agree with the majority that alternative methods of enforcement of the law should be included in the balancing approach, one district court found: The evidence presented before this court clearly established that there is no reasonable or effective alternative method of detection and apprehension available to the Border Patrol, in the absence of the checkpoints, for even a geometric increase in its personnel or line watch would not leave any control over those admitted as temporary visitors from Mexico. *Id.* at 408. Certainly from the record before us, we cannot make a contrary conclusion."

In *Bowen* the minority stated it would have remanded the case for a factual determination so that a proper balancing could be made under the Fourth Amendment. Such remand is not required in the instant case.

Citing opinions of the Ninth Circuit, this court has consistently held that searches for aliens at the Temecula checkpoint are constitutionally permissible. In *Bowen* a majority of the court acknowledges that it has "consistently and repeatedly upheld convictions based upon evidence seized during searches made at fixed checkpoints; in none of these cases has the constitutionality of such searches been questioned." By way of example, the court then cites *United States v. Barron* (9th Cir. 1973) 472 F.2d 1215; *United States v. Campos* (9th Cir. 1972) 471 F.2d 296; *United States v. Aranda* (9th Cir. 1972) 457 F.2d 761; *Mienke v. United States* (9th Cir. 1971) 452 F.2d 1076; *Duprez v. United States* (9th Cir. 1970) 435 F.2d 1276; *Fumagalli v. United States* (9th Cir. 1970) 429 F.2d 1011; *United States v. Avey* (9th Cir. 1970) 428 F.2d 1159; *United States v. Miranda* (9th Cir. 1970) 426 F.2d 283; *Valenzuela-Garcia v. United States* (9th Cir. 1970) 425 F.2d 1170; *Barba-Reyes v. United States* (9th Cir. 1967) 387 F.2d 91; *Renteria-Medina v. United States* (9th Cir. 1965) 346 F.2d 853; *Fernandez v. United States* (9th Cir. 1963) 321 F.2d 283; *Contreras v. United States* (9th Cir. 1961) 291 F.2d 63; and *Cervantes v. United States* (9th Cir. 1960) 278 F.2d 350. A few of these cases involved roving patrols and thus are vitiated by *Almeida-Sanchez.*

However, it is not a matter of stare decisis that has led and again leads us to conclude that the Temecula checkpoint operates within constitu-

tional limits. Instead, it is the reasoning behind the prior Ninth Circuit cases that we find persuasive.

In *Barron, supra,* the court observed that "[i]n the present case, there was a clear government interest in preventing and detecting the illegal entry of aliens into the United States. A checkpoint had been set up on Interstate 5 [commonly known as the Oceanside or San Clemente checkpoint], a major north-south highway extending to the Mexican border, at a location where transportation of aliens who had illegally entered the United States was known to occur." (472 F.2d at p. 1217.)[3]

Another stop at the San Clemente checkpoint resulted in the court concluding that "[t]he stop and the brief detention of the vehicle at an authorized immigration vehicle checkpoint were valid without regard to either an articulable basis for suspicion of illegal conduct or probable cause." (*United States* v. *Campos, supra,* at p. 296.)

In *Mienke* defendant was stopped at the Temecula checkpoint. The court held that the Temecula checkpoint as authorized by 8 United States Code, section 1357(a)(3), is not in violation of the search and seizure clause of the Fourth Amendment or the due process clause of the Fifth Amendment. (452 F.2d at p. 1077.) A Fourth Amendment attack on the Temecula checkpoint was also rejected in *Duprez.* (435 F.2d at p. 1277.)

In *Fumagalli* a stop at an Imperial County permanent checkpoint was involved and approved. Quoting from *Fernandez, supra,* the court observed, "we held that the statute [8 U.S.C. § 1357] granting Border Patrol officers authority to make reasonable searches for aliens 'within a reasonable distance from an external boundary of the United States' was clearly constitutional, as '. . . Congressional recognition of the right of the United States to protect its own boundaries against the illegal entry of aliens. . . .' " (429 F.2d at p. 1013.)

*Barba-Reyes* involved a stop at the San Clemente checkpoint and the constitutionality of the checkpoint stop was affirmed. (387 F.2d at pp. 92-93.)

At the root of most of the Ninth Circuit cases concerning the constitutionality of permanent checkpoints is *Fernandez.* The court found 8 United States Code, section 1357, constitutional and the

---

[3]Interstate 5 and Highway 395 run roughly parallel at the checkpoint locations.

checkpoint operation reasonable thereunder. Of interest is the following excerpt from the case: "The following evidence was introduced by the government concerning the location of this check point: [¶] 'At that time (when appellant was stopped) there were only two roads, Highways U.S. 101 and U.S. 395, connecting Los Angeles with the Mexican border. Los Angeles was a natural place to attract Mexican aliens, having the largest Mexican population of any city on the continent, with the exception of Mexico City itself. Furthermore, non-Mexican aliens also used the road in question, because Tijuana was a center for aliens of any nationality seeking to enter the United States illegally. Los Angeles was close to transportation facilities to all parts of the United States. [¶] Highways 101 and 395 carried all but a small fraction of one per cent of the northbound Tijuana-Los Angeles traffic, as there were mountain ranges that funnelled the traffic through those routes. The highways could be avoided only by taking some circuitous country roads which were rarely travelled. If the checkpoint had been located south of Highway U.S. 80, it could have been evaded by east-west traffic on that route, which runs parallel to the border. [¶] The checkpoint had good road shoulders which could be utilized by stopping vehicles with a minimum of hazard to persons using the highway. [¶] Only about four per cent of the total number of vehicles were directed to the side of the road for further questioning. It was not an arbitrary practice in which every person was stopped and detained. When traffic was light each person was stopped and asked where he was from and where he was going, being delayed thirty seconds or less, and when the traffic was heavy vehicles were not completely stopped but were waved through unless there was a reason to ask additional questions. In that case the vehicle was directed over to the shoulder. [¶] Many aliens who were illegally in the United States had been found at that checkpoint. It had been in operation at least since 31 years before appellant was arrested. There were at least a dozen of such checkpoints in operation along the border between the United States and Mexico.' [¶] We feel that these facts established that the regulation as applied in this case could be considered neither arbitrary nor capricious." (321 F.2d at p. 286.)

The Tenth Circuit in *United States* v. *King* (1973) 485 F.2d 353, summarily concluded in reliance on *Almeida-Sanchez* that "a search at a fixed checkpoint of an automobile for aliens without warrant and without probable cause, ninety-eight miles away from the external boundary, is unlawful, unless the particular fixed checkpoint be in fact a functional equivalent of a border search." (At p. 359.) Dealing with that same checkpoint in *United States* v. *Maddox* (10th Cir. 1973) 485 F.2d 361, the court stated it could not tell from the record whether it was the

functional equivalent of a border search. (At p. 363.) Then, in *United States* v. *Bowman* (10th Cir. 1973) 487 F.2d 1229, the court determined that *Almeida-Sanchez* did not change the rule allowing the Border Patrol to briefly stop a vehicle at a permanent checkpoint to ascertain nationality. It found that *Almeida-Sanchez* only applied to search of a vehicle for aliens. (At p. 1231.)

The Ninth Circuit in *United States* v. *Heinrich* (1974) 499 F.2d 95, relying exclusively on its *Bowen* decision, held that "stops made after June 21, 1973, are unconstitutional when they do not occur at the functional equivalent of the border. [¶] The Temecula checkpoint is 72 miles north of the international boundary and is not the functional equivalent of a border."[4]

The Fifth Circuit is of the opinion that *Almeida-Sanchez* prohibits checkpoint stops and searches unless the location is the functional equivalent of a border search, of which the court takes a very restrictive view. According to the court there is no difference between a roving patrol and a checkpoint. (*United States* v. *Speed* (5th Cir. 1973) 489 F.2d 478; see *United States* v. *Merla* (5th Cir. 1974) 493 F.2d 910.)

Thus the Tenth Circuit has held the stop at a permanent checkpoint permissible but not a search for aliens. The Ninth Circuit has held both the stop and search illegal with the Fifth Circuit being in apparent agreement. However, the Ninth Circuit case making this determination *(Bowen)* is pending before the United States Supreme Court.

██ ██ Although we are bound by decisions of the United States Supreme Court interpreting the federal Constitution, we are not bound by decisions of lower federal courts even on federal questions but they are considered persuasive and entitled to great weight. (*People* v. *Bradley*, 1 Cal.3d 80, 86 [81 Cal.Rptr. 457, 460 P.2d 129].)

Traditionally, it has been held that the Temecula type checkpoint is constitutionally permissible and that neither warrant nor probable cause is necessary to search vehicles for hidden aliens. The developed rule was a recognition of the overwhelming illegal alien problem faced in the United States and the value of permanent checkpoints as a partial control method.

The only significant occurrence as it relates to these checkpoints was

---

[4]An apparently similar Ninth Circuit holding (6/19/74) is *United States* v. *Ortiz*. The United States Supreme Court has granted certiorari in that case. (No. 73-2050.)

the *Almeida-Sanchez* decision. The reasonableness of these checkpoints was established many years ago. To apply *Almeida-Sanchez* to them when at best only four of nine United States Supreme Court Justices so envisioned, is erroneous. Too much has been read into the *Almeida-Sanchez* case by some members of the federal judiciary. Possibly those finding the permanent checkpoint unreasonable under the Fourth Amendment (relying solely on *Almeida-Sanchez*) will be proven to have acute psychic powers in the final analysis. However, at this juncture the United States Supreme Court has not held the permanent checkpoint violative of the Fourth Amendment and we decline to do so.

Upon remand from the Ninth Circuit, the United States District Court, Southern District, California, in *United States* v. *Baca,* 368 F.Supp. 398, conducted a comprehensive factual hearing to evaluate the consequences of *Almeida-Sanchez* on the Border Patrol checkpoints within the jurisdiction of the district court. That opinion concludes that within the concept of "functional equivalent of a border" that the permanent checkpoint at Temecula is within the constitutionally permissible zone.[5]

The selective quotations below from *Baca* are highly relevant to this opinion. "The United States through legislative action has determined that it is in the best interest of the nation to limit the number of persons who can legally immigrate into the country in any given year. These controls reflect in part a Congressional intent to protect the American labor market from an influx of foreign labor. . . . [¶] Currently illegal aliens are in residence within the United States in numbers which, while not susceptible of exact measurement, are estimated to be in the vicinity of 800,000 to over one million. . . . [¶] Of these illegal aliens, approximately 85 percent are citizens of Mexico. . . . [¶] Since 1970, the number of illegal Mexican aliens in the United States who have been apprehended has been growing at a rate in excess of 20 percent per year. . . . [¶] The increasingly large number of Mexican nationals seeking to illegally enter this country reflects the substantial unemployment and underemployment in Mexico—fueled by one of the highest birth rates in the world. Moreover, Mexican employment statistics are not likely to improve dramatically since fully 45 percent of Mexico's population is under 15 years of age and, therefore, will soon be attempting to enter the labor market. [¶] Further prompting Mexican nationals to seek employment in the United States is the fact that there is a significant disparity in wage rates between this country and Mexico. . . . [¶] . . . 250,000 illegal

---

[5]See footnote 2, *supra.*

aliens are employed in Los Angeles County . . . . [¶] Other estimates of the impact of illegal aliens in California suggest that in 1971, when 595,000 Californians were unemployed (7.4 percent of the State's labor force), there were between 200,000 and 300,000 illegal aliens employed in California earning approximately $100 million in wages. . . . [¶] Illegal aliens compete for jobs with persons legally residing in the United States who are unskilled and uneducated and who form that very group which our society is trying to provide with a fair share of America's prosperity. [¶] In addition, illegal aliens tend to perpetuate poor economic conditions by frustrating unionization, especially in such occupations as farm work. [¶] Illegal aliens pose a potential health hazard to the community since many seek work as nursemaids, food handlers, cooks, housekeepers, waiters, dishwashers, and grocery workers. Immigration and medical officials in Los Angeles, for example, have discovered that the illegal alien population in Los Angeles' barrio is infected with a high incidence of typhoid, dysentery, tuberculosis, tapeworms, venereal disease and hepatitis. . . . [¶] In some states illegal aliens abuse public assistance programs. In some instances entire families who entered the country illegally have been admitted to the welfare rolls. . . . [¶] Another aspect of the problem created by illegal aliens is that employed aliens tend to send a substantial portion of their earnings to relatives or friends in Mexico. This outflow of United States dollars exacerbates our balance of payments problem to the extent of $1 billion a year. . . . [¶] The illegal alien problem is one found primarily in the Southwestern Region of the United States. . . . [¶] In fiscal 1973 approximately 208,000 I-186 cards were issued and it is estimated that over two million such cards are currently in circulation. . . . [I-186 cards refer to temporary border passes issued to Mexican nationals for travel no farther than 25 miles from the border and for no more than 72 hours.] [¶] Within the INS [Immigration and Naturalization Service], the U. S. Border Patrol, which was first established in 1924, has the primary function of preventing the illegal entry of aliens and the apprehension of those who have entered illegally and those who smuggle these illegal entrants. [¶] The Border Patrol has approximately 1,700 agents, who are well-trained law enforcement officers, and of these about 80 percent are assigned along our southern border with Mexico. . . . [¶] The number of deportable aliens apprehended by the Border Patrol (which makes the great majority of apprehensions) nationally has grown from 38,861 during fiscal 1963 to 498,123 in fiscal 1973; . . . [¶] While the Border Patrol would like to apprehend all deportable aliens right at the border by agents on the line watch, inspections at regular points of entry are not infallible and illegal crossings at other than legal ports of entry are numerous and recurring. The maintenance of continuous patrol over the vast stretches of the

border in Southern California is physically impossible, since the approximately 145 miles of boundary creates geographic barriers to effective patrol and man-made devices such as fences and electronic devices are in large part ineffective. [¶] Increased manpower on line watch would not make that activity appreciably more effective as was demonstrated in 1969 during "Operation Intercept" when many more agents were stationed immediately on the border, and yet, the number of illegal aliens apprehended by agents operating inland was not significantly different from like periods when such additional manpower was not located at the boundary. . . . [¶] After crossing the line watch some illegal aliens seek employment in the Southern District, but the vast majority attempt to proceed to Los Angeles County and points north. [¶] Once the illegal alien gets settled in a big city far away from the border it becomes very difficult to apprehend him, and therefore, the Border Patrol attempts to contain the illegal entrant within this district. [¶] With this objective in mind, they have (pursuant to their statutory authority discussed above) established, since at least 1927, strategically located traffic inspection facilities, commonly referred to as checkpoints, on highways and roads, for the purpose of questioning vehicle occupants believed to be aliens, as to their right to be, or to remain, in the United States, and also to search such vehicles for illegal aliens. . . . [¶] The primary objective of the checkpoints is to intercept vehicles or conveyances transporting illegal aliens, or nonresident aliens admitted with temporary border passing cards (I-186), with particular attention being paid to vehicles operated by smugglers or transporters destined for inland cities in violation of 8 U.S.C. § 1324." (Pp. 402-406.)[6]

Thus the Border Patrol has established a second line of defense against the illegal alien and smuggler and a first line of defense against the violating I-186 card holder. The above quotation from *Baca* vividly demonstrates the scope of the illegal alien problem. The problem is not one of abstract national security but a very real threat. In fiscal 1973 approximately 8,100 deportable aliens were apprehended at the Temecula checkpoint alone. (*United States* v. *Baca, supra,* at p. 411.)

The Border Patrol is thus engaged in a silent war, being our prime defense against unintended but very real economic and health aggression. Although unarmed and likely frightened, illegal aliens infiltrate this nation daily and constitute a serious threat to the general welfare of this nation and particularly to the residents of the State of California.

---

[6]The District Court Judge in *United States* v. *Fuentes* (S.D.Tex 1974) 379 F.Supp. 1145, is in substantial agreement with the *Bowen* minority and the essentials of the *Baca* conclusions.

The preamble to the United States Constitution recites: "We, the People of the United States, in order to . . . promote the general Welfare, and secure the Blessings of Liberty to ourselves and our Posterity, do ordain and establish this Constitution for the United States of America." Article I, section 8 provides: "The Congress shall have Power . . . [cl. 4] To establish an uniform Rule of Naturalization. . . ." and "[cl. 1] [T]o . . . provide for the common Defence and general Welfare of the United States. . . ." Article IV, section 4 provides: "The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion. . . ." ■ Pursuant to the clear mandate of the Constitution, Congress enacted legislation to enable the Immigration and Naturalization Service to ferret out illegal aliens. (8 U.S.C. § 1357.)

The question resolves itself to one of balancing two interests both mandated by the Constitution. On one hand is the protection of the entire populace from the invasion of the illegal alien and on the other hand the protection afforded the individual pursuant to the Fourth Amendment against unreasonable searches and seizures.

The need for protection through devices such as the permanent checkpoint is obvious. The intrusion to the individual is slight. The extent of the intrusion is this: the citizen's vehicle may be stopped at a permanent checkpoint and a brief citizenship inquiry made. Those areas of the vehicle in which an alien could be hidden may be looked into by an agent. In most cases this means opening the vehicle trunk and nothing more. If no illegal alien is found, the citizen is on his way again with only a few minutes elapsed. There is no wholesale inch by inch search of the vehicle permitted in the absence of probable cause or warrant.

According to *Baca,* at the Temecula checkpoint a conversational stop occurs from 15 to 50 percent of the time. About 5 percent of the vehicles are actually inspected. (368 F.Supp. at p. 412.) Indeed this is a minimal intrusion to the individual which is far outweighed by the need for such intrusion.[7]

---

[7]In *United States* v. *Fuentes, supra,* at p. 1150, the district court judge aptly states: "Balancing the very minor intrusion into our Fourth Amendment freedoms with the all but impossible task that would be placed on the Immigration and Naturalization Service by checkpointless regulations of the flow of aliens, I find that these checkpoints are not an affront to the reasonableness requirement of the Fourth Amendment; to the contrary, they are the very voice of reason. If the Immigration and Naturalization Service is to be deprived of this tool of law enforcement, then we had better be prepared to spend tens of millions of dollars annually to assure that those who are prone to violate our immigration laws are caught at the river's edge when they land."

■ In summary it is our conclusion that *Almeida-Sanchez* did not invalidate permanent checkpoints; that the *Bowen* majority is in error in its holding; that the long established authority for the constitutionality of permanent checkpoints remains vital; and that in balancing the Fourth Amendment right of the individual against the constitutional mandate to secure our nation internally from aliens, the permanent checkpoint activity of the Border Patrol satisfies the constitutional test of reasonableness. (For further consideration of checkpoint operations and selection of locations see *Baca, supra.*)

We need not consider the question of retroactive application of *Almeida-Sanchez* in light of our holding.

Judgment affirmed.

Appellant's petition for a hearing by the Supreme Court was denied February 13, 1975.