Filed 8/29/17

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G052949 |
| v. | (Super. Ct. No. 13ZF0161) |
| CHARLES PATRICK DREW, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Steven D. Bromberg, Judge.  Affirmed.

David M. McKinney, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and Alan L. Amann, Deputy Attorneys General, for Plaintiff and Respondent.

This case requires us to examine the causation requirement for felony murder. The underlying facts are grim. Appellant Charles Patrick Drew sexually assaulted Amber Oceja while she was in a diabetic coma, and within two hours of the assault, Oceja died from diabetic ketoacidosis. The experts all agreed that since Oceja was already unconscious when the sex crimes occurred, they did not materially contribute to her death. Indeed, it appears she would have died when she did even if appellant had not sexually assaulted her. However, appellant did not just sexually assault Oceja while she was unconscious, he failed to seek medical assistance for her knowing she was in dire physical condition – a fact which would remain hidden as long as she was confined in his motel room.

We hold there was a sufficient causal relationship between this fatal omission and appellant's sex crimes to support his conviction for first degree felony murder. We also uphold the jury's true finding on the felony murder special circumstance allegations. While appellant contends that finding must be reversed for lack of evidence he killed Oceja to advance his sex crimes, such evidence was not required – either as a matter of state law or constitutional principle – to warrant a true finding on that allegation. We therefore affirm the judgment sentencing appellant to life in prison without parole for committing special circumstance felony murder.

FACTS

At the time this case arose in 2012, appellant was 62 years old and Oceja was 29. They were both homeless and struggling with drug and alcohol issues, and Oceja was severely diabetic. Appellant knew Oceja needed to take her insulin medicine on a regular basis. He often looked after her and accompanied her to the hospital when her diabetes flared up. Thus, Oceja came to trust and rely on appellant. She viewed him as a caregiver and even listed him with her medical providers as an emergency contact person. Oceja was not interested in appellant from a sexual standpoint, however. She looked at

2

him as a father figure and a friend, not as a romantic partner. Although appellant knew this, it did not stop him from taking advantage of Oceja in the hour of her deepest need.[1]

Being homeless, appellant and Oceja did not have a lot of extra money for private lodging. But from time to time they received motel vouchers from local charities. On Thursday, March 15, 2012, they stayed at a motel in Anaheim, and the next day, they checked into the Motel 6 in Stanton for two nights. Contrary to her health needs, Oceja was not taking her insulin medication during this time. She had stopped doing so because a spiritual healer had advised her prayer, not medicine, was the best way to keep her body healthy. Appellant knew this was not the case and that it was actually very dangerous for Oceja to forego her medication. Yet, over the course of the weekend, he ignored the signs she was becoming increasingly ill due to her lack of insulin.

As it happened, two of appellant's other friends – Gina Culp and Bennie Kuhn – also stayed at the Stanton Motel 6 that weekend. On Saturday the 17th, at about 6 p.m., Culp stopped by appellant's room for a brief visit. At that time, Oceja was filing her nails on the bed and seemed fine. Nothing about her, appellant, or the room struck Culp as being odd or of concern.

But when Culp stopped by the next morning, she sensed a different vibe in the room. Oceja was sitting on the floor with her back against the bed. She did not appear to be physically injured, but her pants were sagging around her hips, and she seemed to be drunk or high. When Culp asked her if she was okay, Oceja said she was fine, but her speech was extremely slurred, and Culp could tell something was wrong with her. At Culp's suggestion, appellant called Kuhn to help him get Oceja up and moving so they could check out of the motel. However, that plan proved fruitless.

When Kuhn arrived at the room, he and appellant tried to get Oceja on her feet, but as soon as they propped her up, she slumped down onto the bed like a "limp

---

[1]     Oceja was not appellant's first victim. In 1994, he raped and assaulted his former girlfriend after beating her unconscious.

3

noodle." Her eyes were rolling back in her head, and Kuhn thought she was drunk or on something. Suspecting Oceja just needed time to sober up, he told appellant he should think about staying in the room another night. Appellant took up the suggestion and booked the room for Sunday evening.

That night at about 5:30, appellant left Oceja in the room and went to a nearby store, where he purchased paper towels, tape, skin cream, a douche kit and a bottle of ammonia. He then went to a liquor store and bought a sexual performance enhancement pill before returning to the motel room. A short time later, at around 7:00 p.m., Culp called appellant's room and spoke to him on the phone. During the call, Culp could hear Oceja talking or mumbling in the background. When she asked appellant if Oceja was okay, he said she was doing fine.

Later that evening, appellant had a brief encounter with the motel manager. The manager was inspecting a broken window on a car that was parked at the motel when appellant stepped out of his room to let the manager know the car was his and that everything was okay. Appellant did not say a word to the manager about Oceja. However, she was so gravely ill she did not make it through the night.

The following morning, on Monday the 19th, appellant told a patron at the motel to call 911. When the police arrived at appellant's room, they found Oceja lying dead on the bed. Although she was not wearing any pants and had obvious trauma around her genital area, appellant denied having any sexual contact with her. He also appeared as though he was trying to make himself cry. Inside the room, investigators found bloody razors and an empty bottle of vodka. They also noticed the curtains were drawn and covered by bedsheets; there was blood on a pillow and the bathroom doorjamb; and the bed mattress, which was wet and bloody, had been flipped over. In a trashcan outside the room, they found an empty ammonia bottle, cleansing cream and two douche kits. And in appellant's car in the parking lot they found Oceja's backpack, which contained several syringes that were filled with insulin.

4

Oceja's body was cold to the touch, indicating she had been dead for some time. Her autopsy revealed she died from acute diabetic ketoacidosis. That condition develops when the body lacks sufficient insulin to convert sugar into energy. When that happens, the person's glucose and ketone levels will begin to increase, and if they do not receive medical treatment, they will eventually lapse into a diabetic coma and die.

At the time of Oceja's death, her glucose level was 520 milligrams per deciliter, which is roughly five times greater than normal. She also had alcohol, methamphetamine and trazodone (an antidepressant) in her system, but those substances did not materially contribute to her death. Rather, it was Oceja's high glucose and ketone levels that rendered her unconscious and caused her to die. Oceja's death was not inevitable, however. An expert witness for the defense testified diabetic ketoacidosis is treatable, and even people with glucose levels much higher than Oceja's have been saved by emergency medical services. Thus, if appellant had called 911 when Oceja became unconscious, she could very well have lived.

Instead of trying to help Oceja, appellant sexually assaulted her in a brutal manner. Her autopsy revealed multiple injuries around her genital area, which was shaven clean, and a large swath of skin running from her outer labia to her anus had been denuded, i.e., "sloughed off." In addition, her inner labia was lacerated, and there were abrasions and a small tear around her anus. She also had bite marks on her thighs and breasts, and her nipples were mutilated. Given the absence of an inflammatory response to Oceja's wounds, the medical examiner determined they were inflicted within two hours of her death, while she was in the throes of a diabetic coma.

The police interviewed appellant multiple times about his relationship with Oceja and their activities at the motel on the weekend she died. Appellant admitted Oceja had never shown any romantic or sexual interest in him prior to then. However, he claimed she wanted to have sex with him after they smoked methamphetamine in their room on Saturday night, so he orally copulated her and penetrated her vagina and anus

5

with his fingers and his penis.  Afterwards, he noticed she did not seem quite right; she had a blank and lethargic look.  Knowing Oceja had not been taking her insulin, he asked her if she wanted to go to the hospital.  At the time, she was involved in a dependency case and trying to reunify with her children.  Appellant said she told him she did not want to go to the hospital because her social worker would find out she had been doing drugs, which would hamper her ability to regain custody of her children, so he just let it go.[2]

The next day, Sunday, appellant said he noticed Oceja was "kind of out of it" when Culp and Kahn were at his room.  However, when appellant came back from the store later that evening, Oceja wanted to have more sex, and he obliged.  Appellant admitted shaving Oceja's pubic hair beforehand and seeing blood coming out of her vagina.  He also admitted being a little rough with her during their sexual activity.  However, he insisted Oceja was fully conscious and into having sex with him; he never heard her complain about anything he did to her.  When they were done, he flipped over their mattress and cleaned the room with ammonia.  He also douched Oceja and wiped her vagina with ammonia before she fell asleep.  By appellant's account, Oceja was fine at that time, but the next morning she was unresponsive, which prompted him to call for help.  Appellant denied harming Oceja in any way.  He said she trusted him more than anyone, and he would never do anything to betray that trust.  However, in speaking with the police, appellant admitted knowing that Oceja probably would have lived if he had done more to help her.  He said he did not call 911 because he did not want the police to question him about Oceja's injuries.

Based on the evidence Oceja was comatose when appellant sexually assaulted her, the prosecution charged him with committing four felony sex crimes on an unconscious person:  Rape, sodomy, oral copulation and penetration with a foreign

---

2      Although appellant told the police that Oceja turned down his offer to take her to the hospital on Saturday night, phone records showed she called 911 on her cell phone at 9:43 that evening.  Not hearing any response on Oceja's end of the line, the dispatcher hung up and called her back.  That call went unanswered.

object. (Pen. Code, §§ 261, subd. (a)(4); 288, subd. (f); 288a, subd. (f) & 289, subd. (d).) Additionally, appellant was charged with assault with a deadly weapon (for cutting Oceja's vagina with a razor blade) and first degree felony murder. (Pen. Code, §§ 245, subd. (a)(1) & 187, subd. (a).) It was further alleged as a special circumstance that appellant murdered Oceja during the commission of the four felony sex crimes. (Pen. Code, § 190.2, subd. (a)(17).)

At trial, the prosecutor acknowledged Oceja died from natural causes, i.e., her diabetes. However, he put forth two theories as to why appellant was legally responsible for her death and should be convicted of murder. Both theories were premised, at least in part, on appellant's failure to seek medical assistance for Oceja once she became incapacitated due to lack of insulin. Under the first theory, the prosecutor argued there was a sufficient causal connection between this failure and Oceja's death to find appellant guilty of first degree felony murder. Alternatively, the prosecutor posited appellant was guilty of second degree implied malice murder on the basis he had a legal duty to help Oceja, and by failing to seek medical aid for her, he breached that duty and knowingly put her life in danger.[3] For its part, the defense argued Oceja consented to having sexual activity with appellant, and her genital injuries were caused by a skin disease, not appellant. The defense also argued Oceja was responsible for her own death because she failed to take her insulin medication and turned down appellant's offer to take her to the hospital.

The jury convicted appellant as charged. After he admitted two prior strike allegations, the trial court sentenced him to life in prison without parole for the murder, plus a concurrent and stayed term of 25-years-to-life on each of the five subordinate counts.

---

[3] Although the failure to help a person is generally not grounds for imposing criminal liability, the prosecutor argued appellant had a legal duty to assist Oceja because he was her caregiver, he assumed responsibility for her, and he put her in a perilous position. (See generally Leavens, *A Causation Approach to Criminal Omissions*, Cal. Law Rev. (1988) Vol. 76, No. 3, p. 547 [discussing the conventional sources of legal duties].)

DISCUSSION

*Causation Requirement for Felony Murder*

Appellant argues there is insufficient evidence to support the jury's verdict of first degree felony murder. In his view, the evidence comes up short in terms of proving a sufficient causal relationship between his sex crimes and Oceja's death. We disagree.

The standard of review for assessing the sufficiency of the evidence to support a criminal conviction is "highly deferential." (*People v. Lochtefeld* (2000) 77 Cal.App.4th 533, 538.) Our task is to review the entire record in the light most favorable to the judgment to determine whether it discloses substantial evidence of the defendant's guilt. (*People v. Alexander* (2010) 49 Cal.4th 846, 917.) "Although we must ensure the evidence is reasonable, credible, and of solid value" (*People v. Jones* (1990) 51 Cal.3d 294, 314), reversal is not warranted unless "'"upon no hypothesis whatever is there sufficient substantial evidence to support the judgment."' [Citation.]" (*People v. Cravens* (2012) 53 Cal.4th 500, 508.)

This case actually involves two aspects of the law on causation. The first aspect, which pertains to the criminal law in general, focuses on whether the defendant's acts or omissions were the proximate cause of the victim's harm. (See 1 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Elements, § 37, p. 313.) Proximate cause is a "'universal factor common to all legal liability,'" including criminal culpability. (*People v. Harrison* (1959) 176 Cal.App.2d 330, 333.) While proximate cause issues rarely present themselves in garden variety criminal cases, they do come up from time to time in murder cases, particularly when there is more than one contributing cause of death.

In that situation, the law is clear: "[A]s long as the jury finds that without the criminal act the death would not have occurred when it did, it need not determine which of the concurrent causes was the principal or primary cause of death. Rather, it is required [only] that the cause was a substantial factor contributing to the result: "'"[N]o

8

cause will receive judicial recognition if the part it played was so infinitesimal or so theoretical that it cannot properly be regarded as a *substantial factor* in bringing about the particular result."' [Citations.] [¶] This is true even if the victim's preexisting physical condition also was a substantial factor causing death. [Citation.] 'So long as a victim's predisposing physical condition, regardless of its cause, is not the *only* substantial factor bringing about his death, that condition . . . in no way destroys the [defendant's] criminal responsibility for the death.' [Citations.]" (*People v. Catlin* (2001) 26 Cal.4th 81, 155-156.)[4]

Appellant contends his sex crimes were not a substantial factor in Oceja's death, and her diabetic ketoacidosis was the sole reason she died. The first part of this contention is correct insofar as there was no evidence appellant's sex crimes substantially contributed to Oceja's death in and of themselves. In fact, the record shows Oceja was already in a diabetic coma when appellant committed those crimes, so they clearly did not cause that life-threatening condition to occur.

However, appellant did not just sexually assault Oceja while she was unconscious. After the assault, he also kept her secluded in their motel room and deliberately refrained from calling 911 for fear the police would question him about Oceja's injuries. Appellant's own medical expert acknowledged that people with much higher glucose levels than Oceja's can be saved by emergency intervention techniques. Thus, as appellant acknowledged to the police, he could have saved Oceja's life if he had simply picked up the phone and called for medical assistance. While Oceja clearly had a serious preexisting medical condition, and there is no guarantee she would have survived if appellant had called for help, there is substantial evidence to support the jury's conclusion that appellant's failure to do so was a substantial factor in her death. (*People*

---

4    Consistent with these principles, appellant's jury was instructed, "There may be more than one cause of death. An act or omission causes death only if it is a substantial factor in causing death. A substantial factor is more than a trivial or remote factor; however, it does not need to be the only factor that causes death."

9

*v. Phillips* (1966) 64 Cal.2d 574, 578-579, overruled on other grounds in *People v. Flood* (1998) 18 Cal.4th 470, 490, fn. 12 [despite child's serious preexisting illness, evidence showed defendant's actions in dissuading the child's parents from having her undergo potentially life-saving surgery was a substantial factor in child's death]; *People v. Stamp* (1969) 2 Cal.App.3d 203, 209 [despite victim's preexisting illness, jury could reasonably find defendants' actions in frightening victim during robbery caused him to suffer a fatal heart attack 20 minutes after the robbery].)

The second component of causation at issue in this case pertains particularly to the felony murder rule. That rule is set forth in Penal Code section 189, which states, "All murder . . . which is committed in the perpetration of, or attempt to perpetrate [certain enumerated felonies, including the sex crimes appellant committed here] . . . is murder of the first degree." The rule exists "to deter those who commit the enumerated felonies from killing by holding them strictly responsible for any killing . . ., whether intentional, negligent, or accidental, during the perpetration or attempted perpetration of the felony. [Citation.] 'The Legislature has said in effect that this deterrent purpose outweighs the normal legislative policy of examining the individual state of mind of each person causing an unlawful killing to determine whether the killing was with or without malice, deliberate or accidental, and calibrating our treatment of the person accordingly. Once a person perpetrates or attempts to perpetrate one of the enumerated felonies, then in the judgment of the Legislature, he is no longer entitled to such fine judicial calibration, but will be deemed guilty of first degree murder for any homicide committed in the course thereof.' [Citation.]" (*People v. Cavitt* (2004) 33 Cal.4th 187, 197; see also *People v. Dillon* (1983) 34 Cal.3d 441, 477 [felony murder rule encompasses "a variety of unintended homicides resulting from reckless behavior, or ordinary negligence, or pure accident"].)

For purposes of the felony murder rule, the duration of the underlying felony extends until the time the defendant has reached a place of temporary safety.

10

(*People v. Wilkins* (2013) 56 Cal.4th 333, 340-341; *People v. Portillo* (2003) 107 Cal.App.4th 834 [escape rule applies to sex crimes].)  Thus, a defendant may be convicted of felony murder for a fatality that occurs after the underlying felony has been completed.  (See, e.g., *People v. Thompson* (1990) 50 Cal.3d 134, 171-172 [defendant liable for felony murder for strangling victim after felony sex crimes were already finished]; *People v. Portillo, supra,* 107 Cal.App.4th 834 [same].)  In other words, the acts constituting the felony need not be the same acts that caused the victim's death.  (*Ibid.*)

However, defendants are not legally responsible for every death that occurs during the commission of their felonies.  Rather, liability under the felony murder rule is triggered only when there is what the law deems a sufficient connection between the defendant's felonious conduct and the victim's death.  (See Tanaka & Lawrence, *Developments in California Homicide Law*, Loyola of Los Angeles Law Rev. (Summer 2003) Vol. 36, No. 4, at p. 1490 ["the mere existence of a felony and a killing in a particular set of facts does not automatically trigger the felony-murder doctrine"]; Crum, *Causal Relations and the Felony-Murder Rule*, Wash. U. Law Rev. (1952) Vol. 2, pp. 194-195 [for the felony murder rule to apply it is "not sufficient merely that death occur during the commission of the felony," rather, there must be a cause and effect relationship between the two].)

While the law does not require "proof of a strict causal relationship between the felony and the homicide" (*People v. Chavez* (1951) 37 Cal.2d 656, 669), there must be some connection between the two.  As our Supreme Court has explained, "'[T]he felony murder rule requires both a *causal* relationship and a *temporal* relationship between the underlying felony and the act resulting in death.' . . .  The causal relationship is established by a 'logical nexus' between the felony and the homicidal act, and the '[t]emporal relationship is established by proof the felony and the homicidal act were part of one continuous transaction.'"  (*People v. Wilkins, supra,* 56 Cal.4th at pp.

346-347, quoting *People v. Cavitt, supra*, 33 Cal.4th at p. 193.) So "logical nexus" rather than strict "cause and effect" is what the law requires.

Here, the evidence established Oceja was in a coma and in desperate need of help when she was alone with appellant in their motel room on the evening of Sunday, March 18, 2012. However, rather than seeking medical assistance for Oceja, appellant decided to satisfy his own desires. Every minute he spent sexually assaulting Oceja was another minute he spent not helping her and further imperiling her life. Thus, the assault and the failure to seek help were not just connected by time and space, the former actually contributed to the latter. This was sufficient evidence to satisfy the logical nexus requirement.

As for the continuous transaction requirement, the record shows Oceja died within two hours of appellant's sex crimes. During that time, appellant did not leave the motel, and therefore the sex crimes, although physically complete, were still ongoing for purposes of assessing his liability under the felony murder rule. Indeed, appellant readily admits Oceja "died during the commission of the enumerated felonies[.]" It is also clear appellant had complete control over Oceja while she laid incapacitated and isolated in their motel room. There were no intervening acts or events between appellant's felonious conduct, his failure to seek medical assistance, and Oceja's death. Under these circumstances, the jury could reasonably find the continuous transaction requirement was met. (*People v. Thompson, supra,* 50 Cal.3d at pp. 171-172 [continuous transaction requirement satisfied where defendant had control over the victim from the time he committed underlying sex crimes until the time she died 1-2 hours later].)

In arguing otherwise, appellant focuses on the relationship between his sex crimes and the medical cause of Oceja's death, i.e., diabetic ketoacidosis. Because the sex crimes did not cause Oceja to lapse into a coma or accelerate her death, appellant contends the requisite causal relationship was lacking in this case. However, as we have explained, Oceja's diabetes was not the only cause of her death; appellant's failure to

12

seek medical assistance for Oceja was also a substantial factor in her fatal demise. Given Oceja's severely asthenic condition, appellant's failure to act was legally indistinguishable from locking her in a room until she starved or stuffing her in a freezer until she froze to death. For the reasons explained above, we believe there was a sufficient connection between that omission and appellant's sex crimes to satisfy the causation requirement for felony murder.

Appellant challenges this conclusion on doctrinal grounds, suggesting a conviction for first degree felony murder can never be based on the failure to act. He asserts that when a person dies as the result of an omission, even an omission that occurs during the commission of a felony, "a conviction of second degree murder, as a matter of law, would be called for . . ., not first degree murder."

In making this argument, appellant relies heavily on the fact the prosecution's theory of second degree implied malice murder was based on his failure to seek help for Oceja. Appellant seems to think this somehow precludes a finding he committed first degree felony murder based on the very same failure. However, as we have pointed out, the prosecutor also relied on appellant's failure to seek medical assistance for Oceja in arguing he was guilty of first degree felony murder. Over and over during his summation to the jury, the prosecutor identified appellant's failure to pick up the phone and call 911 for help as a factual predicate underlying the state's felony murder theory. Since this was a valid factual basis for first degree murder it matters not that the same facts also formed the foundation for the lesser crime of second degree murder. (See generally *People v. Belmontes* (1988) 45 Cal.3d 744, 789 [prosecutor can argue alternative theories of culpability based on the same set of underlying facts].)

Lack of precedent is another reason appellant opposes the imposition of felony murder liability based on the failure to act. As to that point, appellant claims he "has found no decisional authority for the proposition that the required causal connection for a felony murder conviction can be an omission to act, nor has respondent provided

such authority." However, respondent did cite *People v. Phillips, supra,* 64 Cal.2d 574, in which our Supreme Court found the defendant's actions in convincing the parents of a seriously sick child to forego surgery for the child was the proximate cause of the child's death. (*Id.* at pp. 579-580.) Although the underlying felony in that case (grand theft) did not constitute a sufficiently serious crime to invoke the felony murder rule (*id.* at pp. 583-584), the case demonstrates how liability can flow from decisions that result in the failure to assist victims who are particularly vulnerable.

Appellant is correct that the precedential landscape here is not lush. Because most criminal cases involve affirmative acts of misconduct, this type of case is relatively uncommon. However, our independent research has disclosed cases where the felony murder rule has been applied to cover omissions and the failure to seek aid for a person in need. (See, e.g., *Johnson v. State* (Ga. 2013) 742 S.E.2d 460, 463 [felony murder conviction properly based on the defendant's failure to prevent her son from accessing dangerous medication and "failing to seek medical treatment once it became clear he was ill"]; *State v. Stewart* (R.I. 1995) 663 A.2d 912 [upholding felony murder conviction based on the defendant's failure to feed and care for her child].) While not controlling, these out-of-state decisions undermine appellant's assertion that felony murder based on an omission or the failure to render assistance is a concept alien to American criminal law.

Our research also reveals that in some states the felony murder rule is worded in such a way as to preclude its application in cases where the defendant's culpability is based on an omission. For example, under Texas law, the felony murder rule applies only when the defendant commits or attempts to commit a felony, and in doing so, "he commits or attempts to commit *an act* clearly dangerous to human life that causes the death of an individual." (Tex. Pen. Code, § 19.02, subd. (b)(3), italics added.) Based on the plain wording of this law, a person cannot be convicted of felony murder in

Texas if the victim's death is attributable to an omission, as opposed to an affirmative act. (*Rodriguez v. State* (Tex. Ct. Crim. Apps. 2014) 454 S.W.3d 503, 507-508.)

California's felony murder rule is not worded so restrictively. It applies broadly to all killings "committed in the perpetration of, or attempt to perpetrate" one of the statutorily enumerated felonies. (Pen. Code, § 189.) That being the case, we are reluctant to impose any additional limitations on the causal requirement for felony murder in this state. We see no reason in law or logic why the felony murder rule, when otherwise applicable, cannot be applied when the victim dies as a result of inaction by defendant.

In attacking his conviction for felony murder, appellant also argues the evidence does not support the jury's conclusion he was legally responsible for Oceja's death. The way he sees it, Oceja caused her own death by failing to take her insulin medication, telling appellant she was fine, and declining his offer to take her to the hospital. However, once Oceja slipped into a coma, appellant had to know something was seriously wrong with her. Even though he had seen Oceja wake up after passing out from drug and alcohol use on prior occasions, this time was different because, as appellant knew, she had not taken her insulin medication for several days. Under these circumstances, the jury could reasonably find appellant was remiss for failing to seek assistance for Oceja. The jury could also find appellant's sex crimes were sufficiently related to this failure to support his conviction for first degree felony murder. There is no basis for disturbing the jury's finding in that regard.

*Felony Murder as a Special Circumstance*

Appellant also challenges the jury's true finding on the felony murder special circumstance allegations. He contends the finding must be reversed for lack of evidence he killed Oceja in order to advance his sex crimes, but as we now explain, the law does not require any such evidence.

15

Under California's special circumstances statute, the punishment for first degree murder is death or life in prison without parole if the jury finds the murder was committed while the defendant was engaged in the commission of certain enumerated felonies, including the sex crimes appellant was convicted of in this case. (Pen. Code, § 190.2, subd. (a)(17)(C), (D), (F) & (K).) In *People v. Green* (1980) 27 Cal.3d 1, 61, our Supreme Court interpreted this statute to mean the felony murder special circumstance cannot be applied when the felony is merely incidental to the killing. However, that does not mean the felony murder special circumstance can *only* be applied when the evidence shows the killing was committed to advance an independent felonious purpose. To the contrary, the California Supreme Court has repeatedly rejected the idea that such evidence is required to invoke the felony murder special circumstance. (*People v. Rountree* (2013) 56 Cal.4th 823, 854; *People v. Dement* (2011) 53 Cal.4th 1, 46-47; *People v. Dykes* (2009) 46 Cal.4th 731, 760-761; *People v. Horning* (2004) 34 Cal.4th 871, 907-908; *People v. Valdez* (2004) 32 Cal.4th 73, 112-114; *People v. Kimble* (1988) 44 Cal.3d 480, 501.) Through these decisions, our high court has made it clear the felony murder special circumstance only requires the defendant to *have* a felonious purpose that is independent of the killing; it does not require the killing be committed in order to *advance* that felonious purpose. (*Ibid.*)[5]

That being the case, it doesn't matter that appellant did not kill Oceja in order to advance his sex crimes. Because the record shows he committed his sex crimes for reasons independent of the killing, i.e., for his own sexual gratification, that is a sufficient basis to support the jury's finding on the felony murder special circumstance allegations.

---

[5] As appellant points out, the Ninth Circuit Court of Appeals requires both of these components to apply the felony murder special circumstance. (See *Pensinger v. Chappell* (9th Cir. 2015) 787 F.3d 1014, 1026.) However, decisions from our own Supreme Court take precedence over Ninth Circuit authority. (*People v. Cummings* (1974) 43 Cal.App.3d 1008, 1019; *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

16

Lastly, appellant contends that unless the felony murder special circumstance is interpreted to require proof the subject murder was carried out to advance an independent felonious purpose it would violate due process and the Eighth Amendment for failing to narrow the class of persons who are eligible for the death penalty. (*Zant v. Stephens* (1983) 462 U.S. 862, 877.) However, appellant was not sentenced to death, he was sentenced to life in prison without parole. For a crime as serious as felony murder, that is not a disproportionate sentence under the Eighth Amendment. (*Harmelin v. Michigan* (1991) 501 U.S. 957, 1004.)

Moreover, by requiring an independent felonious purpose for special circumstances felony murder, the felony murder special circumstance satisfies due process. (*People v. Andreasen* (2013) 214 Cal.App.4th 70, 80-82.) Indeed, the California Supreme Court has consistently upheld the felony murder special circumstance against claims it fails to properly narrow the class of persons who are subject to the death penalty. (See, e.g., *People v. Brown* (2014) 59 Cal.4th 86, 119; *People v. Martinez* (2010) 47 Cal.4th 911, 967; *People v. Pollock* (2004) 32 Cal.4th 1153, 1195; *People v. Gurule* (2002) 28 Cal.4th 557, 663; see also *Brown v. Sanders* (2006) 546 U.S. 212, 223–224 [California's robbery-murder special circumstance satisfies the narrowing requirement for imposition of the death penalty].) There is no constitutional impediment to applying the felony murder special circumstance in this case.

17

DISPOSITION

The judgment is affirmed.


                                        BEDSWORTH, ACTING P. J.
WE CONCUR:


MOORE, J.


THOMPSON, J.