Filed 2/21/14  P. v. Garcia CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H038479 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. CC941517) |
| v. | |
| RALPH ANTHONY GARCIA, | |
| Defendant and Appellant. | |

After a jury found Ralph Garcia (appellant) guilty of the first degree murder of Enrique Flores (Pen. Code, § 187), and found true the allegation that the crime was committed for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further or assist in criminal conduct by gang member (§ 186.22, subd. (b)(1)(C))[1], the court sentenced appellant to 25 years to life in state prison for the murder conviction consecutive to 10 years for the gang enhancement.

Appellant filed a timely notice of appeal.  On appeal, appellant raises several issues of alleged instructional error, which we shall outline later.  For reasons that follow, we affirm the judgment.

### Proceedings Below

An information filed on June 4, 2009, charged appellant and two codefendants—Raymond Garcia and Ernesto Esparza—with the murder of Enrique Flores.  As to all the

---

[1]    All unspecified section references are to the Penal Code.

defendants the information alleged that the murder was committed for the benefit of a criminal street gang.[2]  Before trial, both Raymond Garcia and Ernesto Esparza resolved their cases.  Esparza pleaded guilty or no contest to voluntary manslaughter and admitted the gang allegation in exchange for his truthful testimony against appellant and a sentence of no more than 21 years in state prison.  Raymond Garcia pleaded no contest to voluntary manslaughter and admitted the gang allegation; the court gave an indicated sentence of six years in state prison.

*Evidence Adduced at Trial*

We are required to set forth the evidence in the light most favorable to the judgment.  (*People v. Valencia* (2002) 28 Cal.4th 1, 4, overruled in part on other grounds in *People v. Yarbrough* (2012) 54 Cal.4th 889, 894.)

*Lauren Worthington[3]*

On April 17, 2009, Lauren Worthington, who was at the time appellant's girlfriend, argued with appellant because appellant said that he wanted to break up with her.  She drove to San Jose during the afternoon of the 17th to talk to appellant.  However, she ended up giving him a ride to his friend's house near a mini mart located at the corner of Almaden and Foxworthy.[4]  They did not discuss their relationship because

---

[2]    As can be seen, section 186.22, subdivision (b)(1) uses the phrase "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ."  We abbreviate this to "for the benefit of a criminal street gang."

[3]    In lieu of Worthington's live testimony, the prosecutor played a video of a conditional examination that was conducted on February 1, 2012.  The court informed the jury that Worthington was not available and that a bench warrant for her arrest had been issued for her failure to appear.  The court told the jury that at the time of the conditional examination three defendants were present; the attorneys for two of the defendants— Raymond Garcia and Ernesto Esparza questioned Worthington and counsel for Raymond Garcia had requested the conditional examination and conducted the direct examination.  In fact, appellant's counsel had cross-examined Worthington at the conditional examination along with the prosecutor.

[4]    The mini mart is referred to as a liquor store by some witnesses.  For the sake of clarity we use the term mini mart.

there were two other people in the car. At the time, appellant did not appear to be intoxicated. Worthington went to a friend's house, but later that evening called appellant so they could discuss their relationship. She arranged to meet him in the parking lot of the mini mart where she had dropped him off earlier in the day. She arrived there sometime before 10 p.m. Worthington was three months pregnant with appellant's child at the time.

Worthington said that when appellant got to her car he appeared to be intoxicated; he had a beer in his hand and smelled of alcohol. However, he did not slur his words and he appeared to understand her. Appellant ingested some cocaine while he was in the car. Instead of talking about their relationship Worthington told appellant what she had done earlier in the day with her friends. Appellant listened to her, but at some point got out of the car. A few seconds later, Worthington saw a confrontation involving appellant taking place behind her car. She saw two people join appellant; she saw what was happening in her rearview mirror.

Appellant got back into Worthington's car; he told her that he had stabbed someone, but he did not show her a knife or say what he did with it and she did not see him with a knife. She took appellant to an apartment building. After reviewing a transcript of a statement she made to police on April 29th, 2009, Worthington agreed she had told the police that appellant had told her—either that evening or the next day—that he threw the knife in a creek. She agreed that he said that he threw the knife in the creek after changing his shirt. Worthington told the police that she did not know which creek.

Worthington agreed that she told the police that as she was driving out of the mini mart parking lot she saw the victim lying on the ground; she testified that she did not recognize this person. Further, she did not see the two men who had been with appellant during the confrontation.

Moreover, Worthington agreed that in the April 29th interview she had told the police that appellant was not a Norteño, but she testified that was not true. She admitted

3

that she lied to the police about some things and that she was not sure what to say about appellant's gang affiliation. Worthington testified that during the time that she was dating appellant, she had never seen him exchange harsh words with anyone, brandish a knife in a threatening manner, or fight anyone. She said he had a reputation as someone who would not fight. Worthington referred to appellant as a "poodle Norteño," meaning someone who was all talk and no action. Worthington confirmed that in the April 29th interview she told the police that she thought appellant might have stabbed the victim to impress her or show he was not a "poodle." She testified that appellant said he was sorry for having involved the two people that were with him.[5]

Worthington agreed that statements she made to the police about her and appellant arguing in the car, that appellant said he stabbed the victim because he was a "scrap," that appellant never said the victim had a weapon, and that he never said he was acting in self-defense, were all true.

On cross examination by appellant's counsel, Worthington testified that she found out in March 2011 that appellant had another girlfriend in 2009 who was pregnant at the same time she was pregnant. Worthington said she was furious when she learned this information; in addition, she was furious on April 17th, 2009, because she learned that appellant had slept with his other girlfriend the night before. Worthington admitted she was still furious when she spoke to the police. She admitted that statements she gave to the police were different than statements she gave to a defense investigator in March

---

[5] During the conditional examination, portions of the audiotapes of Worthington's police interview were played and then Worthington was asked follow-up questions. Many of counsel's questions consisted of asking if what was on the tape was the truth, without reference to the statements made. After a portion of the video of the conditional examination was played for the jury, the court noted that a problem had arisen because the audio recording of Worthington's taped interview that was being played to refresh her recollection was of questionable quality. Accordingly, the court suggested that counsel make copies of relevant excerpts from the transcript of her police interview so they could be provided to the jury. The court informed the jury that the transcript of the audio played for Worthington would be provided to them during deliberations.

4

2010. She explained, however, that she lied to the defense investigator because she wanted appellant to think she was on his side and because she wanted to take their son to visit him in jail. Worthington conceded that she had been distraught on April 17th, 2009, because appellant wanted to break up with her. She had sent love letters to him in the jail and still loved him at the time she was testifying against him. She denied that she apologized to anyone in appellant's family for lying about him to the police.

On cross-examination by Esparza's counsel, Worthington said that appellant usually carried a folding knife, but she did not see the knife on April 17th. After appellant got out of the car that night, she heard yelling behind the car so she looked in her rearview mirror. It was dark and she could see the individuals only from the waist up. She saw Esparza, but not Raymond Garcia. She could not recall if Esparza made any punching movements. Further, she was not sure if the victim she saw on the ground after the confrontation was the same individual she saw standing up. She had not seen appellant since Father's Day of 2011 and had accepted the end of their relationship. She said she was not testifying to get back at him.

During the prosecutor's cross-examination of Worthington, she explained that the term "scrap" means a southerner or Sureño. She testified that she understood that if a northerner sees a southerner, they will "[b]eat the shit out of them, whatever they need to do." She said that when appellant was in the car before the confrontation, she had been crying and yelling at appellant; he acted as if he did not care. She did not know why appellant got out of the car when he did. She said the confrontation was right behind her car. In addition to appellant and Esparza, she saw someone in a hat, but she could not recall the color. When appellant got back in the car she knew it was time to leave and that there had been a fight. She thought it was appellant that she heard shout "norte" during the fight. She confirmed that appellant told her no one else had a knife and that someone punched the victim once and then the victim fell to the ground; that appellant

5

told her that he and his two friends hit the victim; also he stabbed the victim in the chest, but he did not tell her how many times.

*Sonia Perez*

In April 2009, Sonia Perez lived in an apartment complex next to the strip mall where the mini mart was located. On the night of April 17th, 2009, at around 10 p.m. she was parked in the strip mall while talking to her husband on her telephone about whether he needed her to "pick him up." A white car with three occupants was parked near her; the car was facing out toward the parking lot. The driver was wearing a red hat and another occupant was wearing a 49er jersey.

Perez saw one of her neighbors, Enrique Flores, leaving the mini mart; he was talking to someone wearing a "black hoodie";[6] the man was shorter than Flores. After Flores took a few steps, it appeared to Perez that the conversation became confrontational. The man in the "hoodie" blocked Flores and appeared to be "in his face"; the man raised his hands in a challenging manner. As he did so, it appeared to her that Flores did not want a confrontation because he stepped back. The man in the red hat and the man in the 49er jersey got out of the white car and "rush[ed]" Flores. The man in the red hat punched Flores so hard that Perez could hear the sound it made from about 45 feet away. Flores fell to the floor "like a sack of potatoes"; then the three men "ambushed" Flores. The men all bent over Flores and punched Flores repeatedly. Flores was on his back not moving; he was not fighting back. According to Perez, the punching went on for several minutes; she called the police. As Perez moved her car in the parking lot the three men ran off, but she did not see where they went. Perez did not see a weapon during the attack.

According to Perez, frequently she saw Flores wearing blue pants and a blue hat, which appeared to be part of his work uniform. Blue was not common around the

---

[6]     Perez was not positive that it was a black "hoodie."

apartment complex; rather, red was worn in the neighborhood. The prosecutor showed Perez photographs that came from a video from the mini mart that Perez had viewed when she went to the police station. One photograph showed an individual in a red hat; Perez thought she recognized the individual as the person that struck Flores. In another photograph Perez recognized an individual in a 49er jersey as the person that was the passenger in the white car. On cross-examination, Perez testified that she had seen both of these individuals earlier in the day; they were with a group in the carport area of the nearby apartment drinking and "carrying on." Perez was not able to identify the man in the black "hoodie" as she had not been close enough to see the faces of any of the attackers.

*Officer Timothy Alford*

At 10:07 p.m. on April 17th, 2009, San Jose Police Officer Timothy Alford was dispatched to the mini mart at Almaden and Foxworthy. He saw a man lying on the ground; the man was wearing blue cotton Dickies pants, and a darker hooded sweat shirt with a shirt underneath. The man had a cut on his swollen lip and blood coming from his mouth and fresh redness around his right cheek. The man had a pulse, but his breathing was shallow and he was making gurgling sounds. The man was unresponsive. When another officer lifted the man's shirt, Officer Alford could see that he had multiple stab wounds to the abdomen and chest.

*Ernesto Esparza*

After Esparza entered a plea in this case he testified for the prosecution. He said that on the evening of April 17th, 2009, he and Raymond Garcia (Raymond)[7] went to the home of their friend Daniel Lechuga. Lechuga lived in the apartment building near Almaden and Foxworthy. Several other people were at the apartment, including

---

[7] Since appellant's last name is Garcia we will refer to Raymond Garcia as Raymond to avoid any confusion. No disrespect is intended.

7

appellant; they were all drinking and smoking cigarettes. Part of the time they were outside near the strip mall. They planned to go to the drive-in movie theater.

Esparza knew appellant because they were in the same Norteño gang—FOES, which stands for Family on Every Side. Raymond and most of the men at Lechuga's apartment were in the same gang. Esparza said that he was wearing a 49er jersey that night, Raymond was wearing a red hat and appellant was wearing a black shirt; Lechuga was wearing a green shirt and a black beanie. Appellant had been using a lot of cocaine that night, but it did not prevent him from having a conversation. Esparza testified that when he used cocaine it helped him to "sober up."

Esparaza said that at one point he, Raymond, appellant and some others went outside to smoke cigarettes. Appellant walked off toward the parking lot while talking on his telephone. Raymond wanted to make sure that appellant was safe; Esparza and Raymond followed appellant at a distance. After they saw appellant get into Lauren Worthington's car, they decided to turn back and smoke some marijuana. However, they saw a white car that belonged to the mother of Raymond's baby in the parking lot of the mini mart and so they got into it. Raymond got into the driver's seat and he got into the passenger seat. The car was backed into the parking stall.

As they were preparing to smoke some marijuana, Raymond saw appellant and said something to Esparza. When Esparza looked up, he saw appellant "and some guy just like squaring up, like facing each other." Appellant had his hands near his waist as if he was ready to "start swinging." The other man was back on one foot. However, because they were right next to Worthington's car, Esparza thought that the stranger was the aggressor. Esparza had not seen appellant get out of Worthington's car.

According to Esparza, Raymond got out of the car and sprinted over to appellant; Raymond punched the man that was with appellant. As Esparza ran up, Raymond and appellant were on either side of the man on the ground; they were beating him. Esparza testified that the way appellant was beating the man appeared to him to be "weird." It

8

appeared as if appellant was hitting him with the side of his fist with what appeared to be soft blows. Appellant struck the man with "a bunch of little mini punches" in the chest and side. Appellant was using his right hand in a rapid motion. Esparza admitted to kicking the man, but said he just grazed him. Then, he "swooped down to start hitting him," but realized that the man was not moving so he was no longer a threat. Esparza said that at that point he was by the man's feet, and Raymond and appellant were by the man's torso. Esparza estimated the attack lasted no more than one minute. Esparza testified he did not see a knife in appellant's hand, but he was the only person that he saw strike the man in the chest. He could not tell if the man was bleeding. Raymond's back was toward Esparza.

Esparza said that after the beating, he and Raymond went back to the area where they had been smoking and drinking with the group of people that were at Lechuga's apartment. Appellant got back in Worthington's car. Raymond kept saying that he had to go back to his girlfriend's car. However, when they started to go back they saw police officers and the man lying on the ground. They ran through the apartment complex and eventually returned to Lechuga's apartment; appellant was already there. Lechuga suggested that Esparza take off his 49er jersey so he would not be recognized, which he did. Esparza left the jersey at Lechuga's apartment. He went to the parking lot and got his car and then met the others at the drive-in movie theater.

At the drive-in theater, appellant told him that he had stabbed the man. Esparza was not quite sure what to say. He did not recall appellant saying he stabbed the man because he was a "scrap." Appellant told him that he got out of Worthington's car because the man was "mugging him," that is giving him a dirty look.[8] Esparza said he knew that appellant carried a folding knife at times. Appellant told him that he threw the knife in the creek behind the apartment complex. Raymond told him that he had been

---

[8] Esparza explained that mugging is a sign of disrespect that is not tolerated by gang members.

9

"pocket checking" the man, meaning searching him. Raymond said he took the man's telephone.

According to Esparza, Daniel Lechuga was upset when he found out appellant had stabbed Flores. Before the stabbing there had been some concern that Flores was a Sureño, but Lechuga had assured everyone that Flores was a family member. Esparza said he did not know that the man they confronted was Flores at the time of the beating; he learned that later that night.

After they went to the drive-in theater, Esparza, appellant and some others went to Esparza's house. While there, they received a telephone call informing them that Flores had died. Everyone got really quiet; appellant appeared stunned. The group started discussing what they were going to do; appellant said that he would take responsibility for the killing.

Esparza said that after the night of the stabbing he went to his girlfriend's house and stayed there. Appellant tried telephoning him, but they did not talk about the stabbing. Later, when Esparza saw appellant at court, he asked appellant if he was going to take responsibility, but appellant said he was going to get a lawyer. Appellant never said that he was defending himself the night of the attack.

On cross-examination, defense counsel questioned Esparza about the relative heights of the people involved in the confrontation. Esparza said Flores was "a lot bigger than" appellant; in fact he was taller than both appellant and Raymond. Esparza testified that his height was five feet seven and a half inches or five feet eight inches, and that Daniel Lechuga was shorter than he was. Esparza confirmed that Jose Lechuga was present "that day." Counsel questioned Esparza about when appellant told him about the "mugging" incident. Esparza said that it happened about a week after he was arrested when he and appellant were going to court together. Esparza could not recall if appellant told him about the "mugging" at the drive-in.

10

Defense counsel questioned Esparza about the last time he had seen Raymond; Esparza said that he had not seen Raymond since the night of the stabbing. Esparza could not recall noticing whether Raymond's hands were cut after the stabbing; he did remember seeing photographs that showed that Raymond had a cut on his hand. Esparza insisted that he saw Raymond throw only one punch.

Esparza provided detailed information about FOES including that the gang had formal meetings, collected dues, engaged in narcotics sales and beat up individuals. He said that Sureños associate with the color blue, and are the enemies of the Norteños. The Norteños associate with the color red and they assault, stab and kill the Sureños as part of their gang membership.

*Dr. Joseph O'Hara*

Dr. Joseph O'Hara performed the autopsy on Flores. He described Flores as being six feet tall. Flores had a sub scalp hemorrhage over his right ear, a round pink abrasion on the back of his left wrist, and lacerations on the left side of his upper and lower lip, where a tooth was missing. Dr. O'Hara could not find any evidence of defensive wounds on Flores's hands. Flores had sustained 10 stab wounds to the chest and abdomen all of which were similar in depth and which appeared to have been inflicted by the same single-edged knife. There was no evidence of hilt marks on the wounds; some of the wounds were clustered together. A four inch deep wound went through the right lung at an angle and then went through the heart; this wound alone would have been fatal. Another wound of a similar size and shape went through the right lung but did not penetrate the heart. Three stab wounds penetrated the liver; another went through the stomach and then penetrated the liver. Four stab wounds all with identical trajectories went through the abdominal wall, into the stomach, and made two defects in the aorta. Dr. O' Hara explained that since the wounds penetrated the aorta, Flores would have died very quickly from loss of blood. Flores had lost approximately one third of his blood.

11

Dr. O'Hara said that the cause of Flores's death was "stab wounds of the chest and abdomen." The blunt force trauma to his head was not a factor.

*Officer Robert Forrester*

Officer Robert Forrester, a crime scene investigator with the San Jose Police Department Homicide Division, photographed Raymond's hands after Raymond was arrested on April 25th, 2009. Raymond had four dots on the web of one hand, which Officer Forrester explained was indicative of gang membership. Raymond had multiple injuries on his hands. Officer Forrester identified a photograph of a 49er jersey taken at the location where it was found, which was 2895 Almaden Expressway, apartment number 7.[9] In addition, Officer Forrester identified a photograph of appellant's left hand that had a tattoo on the middle finger and four CD's with gang writing that were collected from a vehicle in Alameda.

Officer Forrester testified that on April 21st, 2009, he and his partner went to the San Jose Police Department vehicle warehouse to conduct a search of a Pontiac Grand Am, which had been stopped right in front of the mini mart. The search revealed a beer can, various photographs, a cellular telephone, suspected marijuana, a wallet, and a digital camera.

*Detective John Barg*

Detective John Barg collected a surveillance videotape from the mini mart. Although the timestamps on the video were approximately 42 minutes slow, the videotape showed appellant, Esparza, Raymond, Daniel Lechuga and his brother Jose Lechuga in the mini mart approximately an hour before the attack on Flores. Approximately two minutes later, Nancy Nieto, Flores's common law wife and a small child arrived at the mini mart. Nieto hugged Jose Lechuga as she was leaving. Jose Lechuga's girlfriend is Nieto's sister. On the videotape, Jose Lechuga was seen wearing a

---

[9]     Testimony from Detective John Barg, the homicide investigator in the case, established that this was Daniel Lechuga's apartment.

12

black hoodie and a white hat. Appellant was wearing a black t-shirt with a San Jose Sharks logo on the lower right side.

Detective Barg testified that Raymond was the first suspect identified. Raymond's girlfriend Faylene Smith was in a white car that was stopped by officers as she tried to leave the scene. Smith told the officers that Raymond was her boyfriend. Through criminal records Raymond was identified as the suspect in the red hat that could be seen on the videotape. Raymond dyed his hair before he was arrested on April 23rd, 2009. Esparza was arrested on April 24th and appellant on April 29th, 2009; appellant was arrested in Alameda. The booking information listed appellant as five feet ten inches tall and 160 pounds, Esparza as five feet eight inches and 160 pounds, Raymond as six feet and 220 pounds, and Jose Lechuga as five feet six inches and 164 pounds. At the time of trial, appellant's hair was much shorter than on April 17th, 2009; and he no longer had the same facial hair.

On cross-examination, Detective Barg agreed that he gave Worthington a ride to and from the conditional examination. After the examination, she said she was afraid for her personal safety because of her testimony; she feared that appellant's family and members of his gang would retaliate against her. However, at the time Worthington was staying with appellant's sister. Worthington told Detective Barg that she would not come back to testify at appellant's trial and that she was going to move out of the state. When he spoke with her before the trial, she refused to testify. Worthington had asked about the witness protection program, but it was not given to her as she relocated herself.

Detective Barg admitted that Worthington had implicated appellant in the stabbing the day appellant was arrested. When Detective Barg interviewed Worthington, she told him that appellant said he had thrown the knife in the creek. Detective Barg explained to the jury that there was a large creek behind the apartment complex that was next to the mini mart. Although the creek was searched, the knife was never found. Detective Barg

13

conceded that Esparza had first mentioned that appellant said he threw the knife in the creek sometime after Worthington's conditional examination.

*Gang Expert Testimony*

Officer Enrique Hernandez testified as an expert on Hispanic criminal street gangs. At the time of Flores's death FOES was almost unknown to law enforcement. In the years leading up to appellant's trial, the gang had become better known. In describing gangs and gang culture, Officer Hernandez testified that respect "is probably the most important thing to the gang. They want respect. They assault for lack of respect from others. If they feel disrespected in any way, shape, or form, they . . . will attack. That's the biggest thing to them." An assault could occur just because someone looked at a gang member "wrong." A gang member could be perceived as weak by his fellow gang members. If a gang member sees another gang member in a confrontation, he is obligated to get involved and continue to engage in the assault or be perceived as weak.

Officer Hernandez testified in detail to some of the factors that made FOES a criminal street gang. However, since appellant does not contest the jury's finding on the criminal street gang allegation, it is not necessary to recite these facts in detail. As to appellant, Esparza and Raymond being FOES members, suffice it to say that he opined that appellant, Esparza, and Raymond were all members of FOES based on various supporting pieces of information including Esparza's self admission, images on appellant's cellular telephone, the clothing worn the night of the homicide, tattoos, contacts with law enforcement, photographs of the three with other gang members, and self-identification for jail classification purposes.

Officer Hernandez opined that the killing of Flores was committed in association with and for the benefit of the FOES criminal street gang because appellant, Esparza and Raymond were all involved; and the homicide benefitted the gang because it created notoriety and intimidated and instilled fear in the Sureños based on the willingness of the

14

FOES gang members to kill. Officer Hernandez opined that the stabber would brag to his fellow gang members in order to get respect.

On cross-examination, Officer Hernandez admitted that he knew that Flores was not a Sureño and was "related" to Daniel Lechuga, a FOES member. However, he explained that a stabbing "could happen out of a simple thing as disrespect." He reiterated that Flores was wearing blue pants, which in the light of the neighborhood and the people that attacked him, meant "he must have come across as a southerner." In reaching this conclusion, Officer Hernandez took into consideration the information that appellant had said he stabbed a scrap and shouted "norte" during the confrontation.

Detective Ian White testified as another expert on Hispanic gangs. He testified concerning FOES's primary activities and predicate offenses.

*The Defense Case*

Defense counsel called several witnesses in an attempt to implicate Jose Lechuga or Daniel Lechuga as the stabber, and to discredit Worthington's testimony.

Nancy Nieto testified that she was Flores's common law wife. On the night of April 17th, 2009, Flores left to go to the market for her. After he left, she telephoned him and they had an argument. When he failed to return home she went looking for him; she discovered he had been taken to the hospital. While Flores was in intensive care, she called Jose Lechuga and asked where he was; she told him she knew that the people he was with had something to do with the stabbing. When Lechuga asked what had happened, she told him she had told the police that the people he was with had to be involved. Lechuga told her she was "stupid" and asked "[w]hy do you even involve me in this?" After Nieto found out that Flores had died, she called Jose Lechuga again; he told her he was sorry.

On cross examination, Nieto admitted that Jose Lechuga became angry that she had given his name and the name of his brother Daniel to the police. Nieto explained that she had done so because she had seen them earlier that evening. She testified that

15

she did not know the names of the other three people that the Lechugas were with that evening. She said that Jose Lechuga knew Flores well and would not have mistaken him for someone else.

Kory Montrouil, the apartment manager at the apartment complex located on Almaden Road, testified that on April 17th, 2009, he saw three men running from the mini mart toward the apartment complex. One of the men was his neighbor Daniel Lechuga; Lechuga appeared to be frantic. Later, he saw Daniel Lechuga ushering his wife, two children, and three other men into two cars in the complex parking area. Daniel Lechuga kept saying that they had to go; Lechuga appeared to be in a hurry. Earlier in the evening, Montrouil saw a group of men outside drinking beer. When he went out to smoke a cigarette, he saw three men walk toward the mini mart, then run back. One of the men ran upstairs. The other two men appeared to peek around the corner toward the mini mart. If was after this that Montrouil saw Daniel Lechuga ushering everyone into two cars.

Christina Anaya, appellant's sister, testified that Worthington lived with her from January 2011 until December 2011, but she moved out in January 2012. In March 2011, Worthington told Anaya that she "felt bad" because she had exaggerated her "story" about appellant to the police. Worthington explained to Anaya that she was upset because she found out that appellant's other girlfriend was pregnant at the same time she was. According to Anaya, Worthington told her that on April 17th, 2009, she could not see anything out of her car because it was dark and she was facing the wrong direction. Worthington never told her she was afraid of appellant; in fact she said she still had strong feelings for appellant. Worthington was taking prescription medication from bottles that had no labels; she sold pills to some of Anaya's friends. Sometimes Worthington was upset or angry and she could be distracted and forgetful.

On cross-examination, Anaya said she knew that Worthington was a witness in this case, but admitted that she did not know that Worthington implicated appellant in the

16

crime. She conceded that Worthington did not say that she had lied to the police; rather she had exaggerated what she told the police about what she could see out of the rear of the car. Anaya said that when she was having this conversation with Worthington, Worthington did not say she regretted telling the police that appellant had stabbed Flores, or that she regretted telling them that appellant said he had stabbed a "scrap." Anaya admitted she did not know anything about Worthington's surgery or what medication she had been prescribed.

During closing, the prosecutor argued that it was appellant that stabbed Flores, that this was an express malice murder, that appellant premeditated and deliberated before he killed Flores and there was no evidence to suggest that anyone but appellant killed Flores. Defense counsel suggested that it was someone other than appellant that killed Flores, possibly Jose Lechuga, that Esparaza was lying either to cover up his role in the killing or protect someone else, and Worthington was lying because she had a reason to lie since she was angry at appellant.

*Discussion*

Since most of appellant's issues on appeal pertain to alleged instructional error we note the following. The record does not contain a list of jury instructions requested by defense counsel or the prosecutor. During the discussion on jury instructions, the court stated that the court would give CALCRIM No. 625, the instruction of voluntary intoxication. Defense counsel stated, "Thank you, your Honor." The court explained that it intended to give the instruction after "going back over my notes on Ms. Worthington." No further discussion of voluntary intoxication appears in the record. When the court asked defense counsel if she had any objections or observations as to the proposed instructions, defense counsel stated, "Not about the instructions, your Honor."[10]

---

[10]     The court asked if there was anything else that counsel wished to put on the record. Counsel said that the only thing was the fact that she had advised her client that he had an "absolute right to testify" but had chosen not so to do. Appellant confirmed

17

As relevant to the issues on appeal, the court instructed the jury with CALCRIM No. 625 on voluntary intoxication, and CALCRIM No. 401 on aiding and abetting the intended crime.

Specifically, with respect to voluntary intoxication, the court instructed the jury as follows:

"You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether the defendant acted with an intent to kill or the defendant acted with deliberation and premeditation."

With respect to aiding and abetting the crime, the court instructed the jury as follows:

"To prove the defendant is guilty of the crime based on aiding and abetting that crime, the People must prove that, one, the perpetrator committed the crime; two, the defendant knew the perpetrator intended to commit the crime; three, before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; and four, the defendant's words or conduct did, in fact, aid and abet the perpetrator's commission of the crime. [¶] Someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to and does, in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime. If all these requirements are proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an aider or abetter [*sic*]. If you conclude that the defendant was present at the scene of the crime or failed to prevent the crime, you may consider that fact in determining whether the defendant was an aider or abetter [*sic*]. However, the fact that a person is present at a scene of the crime or fails to prevent the crime does not, by itself, make him or her an aider or abetter [*sic*]."

_____

that that was the case.

18

I.       *Alleged Instructional Error on Voluntary Intoxication*

Appellant contends that CALCRIM No. 625, as given here, was deficient because it did not apply to aiding and abetting liability.  Appellant asserts that the court should have given CALCRIM No. 404, which specifically applies to voluntary intoxication as an aider and abettor.[11]

CALCRIM No. 625 allows the jury to consider evidence of a defendant's voluntary intoxication in determining whether the defendant acted with the specific intent required for murder.  (§ 22, subd. (b) [evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed the required specific intent, or when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought].)

"An instruction on the significance of voluntary intoxication is a 'pinpoint' instruction that the trial court is not required to give unless requested by the defendant." (*People v. Rundle* (2008) 43 Cal.4th 76, 145 (*Rundle*), disapproved on another point in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)  "If the defendant in a particular case believes voluntary intoxication is an issue that could affect the jury's determination of the mental state elements of the charged crimes, he or she must request an instruction on that subject." (*Rundle, supra,* 43 Cal.4th at p. 145.)  Furthermore, any "lack of clarity regarding the consideration, if any, the jury should give to evidence of voluntary intoxication, in the absence of a request for an instruction on this subject, is of the defendant's doing, and on appeal he cannot avail himself of his own inaction." (*Ibid.*)

_____

[11]      CALCRIM No. 404 provides, "If you conclude that the defendant was intoxicated at the time of the alleged crime, you may consider this evidence in deciding whether the defendant:  [¶]  A Knew that *<insert name of perpetrator>* intended to commit *<insert target offense>*;  [¶]  AND  [¶]  B Intended to aid and abet *<insert name of perpetrator>* in committing *<insert target offense>*."  (Judicial Council of California Criminal Jury Instructions, 404 Intoxication, p. 169.)

Here, appellant did not request clarifying or amplifying language or that the court also instruct with CALCRIM No 404, which specifically relates voluntary intoxication to aiding and abetting liability. Indeed, appellant raised no objection at all to the instruction regarding voluntary intoxication as given. Accordingly, since appellant did not seek an instruction that described the relationship between voluntary intoxication and aiding and abetting liability, the claim is not cognizable on appeal. (See *Rundle, supra,* 43 Cal.4th at p. 145.) In other words, appellant was required to request any modifications or additions to the voluntary intoxication instruction. (*People v. Lee* (2011) 51 Cal.4th 620, 638; *People v. Verdugo* (2010) 50 Cal.4th 263, 295 [trial court not required to give pinpoint instruction on voluntary intoxication unless requested to do so].)[12]

Appellant contends that if we find that this issue is not cognizable on appeal, defense counsel provided ineffective assistance in failing to object to the instructions as given or request that CALCRIM No. 404 be given.

The test for ineffective assistance of counsel stems from decisions of both the United States and California Supreme Courts. We consider " 'whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and whether the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome.' " (*People v. Carter* (2005) 36 Cal.4th 1114, 1189 (*Carter*), citing *Strickland v. Washington*

---

[12] In *People v. Rios* (2013) 222 Cal.App.4th 704, the defendant complained on appeal that CALCRIM No. 625 " 'precluded the jury from considering intoxication in connection with provocation and imperfect self-defense.' " (*Id*. at p. 724.) This court determined that CALCRIM No. 625 was deficient in that by referring to " 'intent to kill' rather than to express malice or its legal equivalent ('intent to unlawfully kill'), the trial court's voluntary intoxication instruction failed to properly inform the jury that it could consider evidence of defendant's voluntary intoxication on the issue whether or not defendant killed with express malice." (*Id*. at pp. 726-727.) Here, appellant did not raise the issue of any deficiency in CALCRIM No. 625, other than to argue that CALCRIM No. 625 did not apply to aiding and abetting liability; and no evidence of provocation exists in this case.

20

(1984) 466 U .S. 668, 694; *People v. Ledesma* (1987) 43 Cal.3d 171, 217.)  A reviewing court will presume that counsel was competent and that his or her conduct was the basis of sound tactical decisions.  (*Carter, supra,* 36 Cal.4th at p. 1189.)  Accordingly, the burden is on the defendant to demonstrate that his or her attorney was inadequate under the constitutional standard. (*Strickland v. Washington, supra,* 466 U.S. at p. 687.)

Appellant's first hurdle is less a substantive one than a principle of appellate practice.  "If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation."  (*Carter, supra,* 36 Cal.4th at p. 1189.)  Otherwise, the claim may be raised only by a petition for writ of habeas corpus.  (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.)  Actions taken or not taken by counsel at a trial are "typically motivated by considerations not reflected in the record.  It is for this reason that writ review of claims of ineffective assistance of counsel is the preferred review procedure.  Evidence of the reasons for counsel's tactics, and evidence of the standard of legal practice in the community as to a specific tactic, can be presented by declarations or other evidence filed with the writ petition."  (*In re Arturo A.* (1992) 8 Cal.App.4th 229, 243; see also *People v. Mendoza Tello, supra,* at pp. 266-267.)  An ineffective assistance claim may be reviewed on direct appeal only where " 'there simply could be no satisfactory explanation' for trial counsel's action or inaction.  [Citation.]"  (*In re Dennis H.* (2001) 88 Cal.App.4th 94, 98, fn. 1.)

Here appellant has failed to surmount the first hurdle.  Appellant has failed to overcome the presumption that, under the circumstances, the challenged omission could be considered sound trial strategy.  (*People v. Duncan* (1991) 53 Cal.3d 955, 966.)  It is quite apparent from the record that defense counsel made a tactical decision to contest appellant's participation in the assault on Flores.  She argued that Jose Lechuga fit the description of the man Sonia Perez saw challenge Flores; that appellant was too tall to

have been that man and that his clothing did not match the description given. Specifically, counsel argued, "There's been no evidence presented to you that he [appellant] somehow went out to the parking structure and shrunk six inches and changed his clothes." Perez had identified Raymond and Esparza by their clothing as participants in the assault. It was the identity of the third man that was not settled— Perez thought that the man who confronted Flores was wearing a black "hoodie," but in the photographs taken from the video surveillance in the mini mart appellant had on only a black t-shirt. Further, defense counsel vigorously attacked Esparza's and Worthington's testimony; she attempted to impeach their credibility. As to Worthington, defense counsel attempted to show that she was unreliable because of her drug use and as to Esparza that he did not tell the truth during his testimony. Explicitly, counsel asked the jury to acquit appellant despite the fact that he was a gang member; implicitly, her argument was that he was not there. A request for an instruction on voluntary intoxication as it relates to aiding and abetting liability would have been inconsistent with this defense. We cannot fault counsel for failing to pursue two wholly inconsistent defenses.

Accordingly, we reject appellant's argument that he was denied the effective assistance of counsel.

II. *Alleged Error in the Court's Aiding and Abetting Instruction*

Appellant contends that the trial court misstated the elements of aiding and abetting when it orally instructed the jury. However, appellant does not dispute that the written instructions were correct.

After reading the record as it pertains to the jury instructions given, we asked the court reporter to check her transcription. The court reporter filed an affidavit correcting the reporter's transcript at pages 861 and 862. The corrected record affirmatively shows that the court did not misstate the elements of aiding and abetting. [13]

---

[13] At oral argument appellate counsel conceded that the court's instruction was correct.

22

III.     *CALCRIM No. 401*

In two related arguments, appellant contends that CALCRIM No. 401—aiding and abetting the intended crime does not make "sufficiently clear that aiding and abetting murder requires that the aider and abettor act with intent to kill."  Further, he contends that the instructions on aiding and abetting and murder permitted the jury to find that he aided and abetted an implied malice murder if the perpetrator acted with only implied malice.

"Even without a request, a trial court is obliged to instruct on ' "general principles of law that are commonly or closely and openly connected to the facts before the court and that are necessary for the jury's understanding of the case" ' [citation] . . . .  In particular, instructions delineating an aiding and abetting theory of liability must be given when such derivative culpability 'form[s] a part of the prosecution's theory of criminal liability and substantial evidence supports the theory.' [Citation.]" (*People v. Delgado* (2013) 56 Cal.4th 480, 488.)[14]  "[T]he State must prove every element of the offense, and a jury instruction violates due process if it fails to give effect to that requirement. [Citation.]  Nonetheless, not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation."  (*Middleton v. McNeil* (2004) 541 U.S. 433, 437.)

" 'In considering a claim of instructional error we must first ascertain what the relevant law provides, and then determine what meaning the instruction given conveys.' " (*People v. Lopez* (2011) 199 Cal.App.4th 1297, 1305.)  Furthermore, "[w]hen considering

---

[14]     Given the evidence, the prosecutor's theory of liability, and defense counsel's trial strategy, we question whether an aiding and abetting instruction should have been given at all.  However, "we are mindful of the trial court's unique position for determining such issues:  'A trial judge's superior ability to evaluate the evidence renders it highly inappropriate for an appellate court to lightly question [the] determination to submit an issue to the jury.  A reviewing court certainly cannot do so where, as here, the trial court's determination was agreeable to both the defense and the prosecution.' [Citation.]" (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1381.)

a claim of instructional error, we view the challenged instruction in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner. [Citation.]" (*People v. Houston* (2012) 54 Cal.4th 1186, 1229; accord, *People v. Jablonski* (2006) 37 Cal.4th 774, 831; see also *People v. Tate* (2010) 49 Cal.4th 635, 696 [applying reasonable likelihood standard to claim of instructional error or ambiguity].)[15]

" ' "Finally, we determine whether the instruction, so understood, states the applicable law correctly." [Citation.]' [Citation.] We independently assess whether instructions correctly state the law. [Citation.]" (*People v. Lopez, supra,* 199 Cal.App.4th at p. 1305.) " 'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.' [Citation.]" (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)

After independent review, we find no error. The seminal case concerning the definition of aiding and abetting as it stands currently in California is *People v. Beeman* (1984) 35 Cal.3d 547 (*Beeman*). In *Beeman*, our Supreme Court declared: "[W]e conclude that the weight of authority and sound law require proof that an aider and

---

[15] We note that recently in *People v. Pearson* (2013) 56 Cal.4th 393, 476, the California Supreme Court stated that in determining the meaning the instructional charge conveys, "the question is, how would a reasonable juror understand the instruction. [Citation.]" As authority for this proposition, the court cited *California v. Brown* (1987) 479 U.S. 538, 541. However, in *Boyde v. California* (1990) 494 U.S. 370, 379–380, the United States Supreme Court observed that a number of its cases (including *California v. Brown* ) had used numerous different phrasings, and made it a point to settle on the "reasonable likelihood" standard as the single standard of review for jury instructions. In *Estelle v. McGuire* (1991) 502 U.S. 62, 72–73, footnote 4, the United States Supreme Court reaffirmed its commitment to the "reasonable likelihood" standard, and disapproved the standard of review language contained in *Cage v. Louisiana* (1990) 498 U.S. 39, 41, which had noted, "In construing the instruction, we consider how reasonable jurors could have understood the charge as a whole"; and *Yates v. Evatt* (1991) 500 U.S. 391, 401, which had noted, "We think a reasonable juror would have understood the [instruction] to mean . . . ." We need not decide whether our state Supreme Court misspoke in *Pearson,* since, in any event, our conclusion is unaffected.

24

abettor act with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense.  [Citations.]  [¶]  When the definition of the offense includes the intent to do some act or achieve some consequence beyond the *actus reus* of the crime [citation], the aider and abettor must share the specific intent of the perpetrator.  By 'share' we mean neither that the aider and abettor must be prepared to commit the offense by his or her own act should the perpetrator fail to do so, nor that the aider and abettor must seek to share the fruits of the crime.  [Citation.]  Rather, an aider and abettor will 'share' the perpetrator's specific intent when he or she knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime.  [Citation.]"  (*Beeman, supra,* 35 Cal.3d at p. 560.)

The *Beeman* court went on to say: "[A]n appropriate instruction should inform the jury that a person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime."  (*Beeman*, *supra*, at p. 561.)

The definition in *Beeman* regarding aiding and abetting, and of what it means to share the perpetrator's specific intent, remains good law to this day.  (See, e.g., *People v. Delgado, supra,* 56 Cal.4th at p. 486; *People v. Houston, supra,* 54 Cal.4th at p. 1224; *People v. Prettyman* (1996) 14 Cal.4th 248, 259; *People v. Marshall* (1997) 15 Cal.4th 1, 40.)  CALCRIM No. 401, as given here, adequately conveyed those principles.  (See *People v. Houston, supra,* 54 Cal.4th at p. 1224.)

Although " '[a]ll persons concerned in the commission of a crime, . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, . . . are principals in any crime so committed' (§ 31)," "[t]he mental state

25

necessary for conviction as an aider and abettor . . . is different from the mental state necessary for conviction as the actual perpetrator. [¶] The actual perpetrator must have whatever mental state is required for each crime charged . . . . An aider and abettor, on the other hand, must 'act with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense.' [Citation.]" (*People v. Mendoza* (1998) 18 Cal.4th 1114, 1122–1123, quoting *Beeman, supra,* 35 Cal.3d at p. 560.)

An aider and abettor's guilt for an intended crime "is based on a combination of the direct perpetrator's acts and the aider and abettor's *own* acts and *own* mental state." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117.)[16] Thus, the California Supreme Court has "defined the required mental states and acts for aiding and abetting as: '(a) the direct perpetrator's actus reus—a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea—knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus reus— conduct by the aider and abettor that in fact assists the achievement of the crime.' [Citation.]" (*People v. Thompson* (2010) 49 Cal.4th 79, 116–117.) " 'When the offense charged is a specific intent crime, the accomplice must "share the specific intent of the perpetrator"; this occurs when the accomplice "knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime." [Citation.]' [Citation.] What this means here, when the charged offense and the intended offense—murder . . .—are the same . . . is that the aider and abettor must know and share the murderous intent of the actual perpetrator." (*People v. McCoy, supra,* 25 Cal.4th at p. 1118, fn. omitted.) "Aider and

---

[16]     "[U]nder the natural and probable consequences doctrine, an aider and abettor is guilty not only of the intended crime, but also 'for any other offense that was a "natural and probable consequence" of the crime aided and abetted.' [Citation.]" (*People v. McCoy, supra,* 25 Cal.4th at p. 1117.) Only the intended crime is at issue here; accordingly, nothing we say takes into account natural and probable consequences.

abettor liability is thus vicarious only in the sense that the aider and abettor is liable for another's actions as well as that person's own actions. When a person 'chooses to become a part of the criminal activity of another, [he] says in essence, "your acts are my acts. . . ." ' [Citations.] But that person's *own* acts are also [his] acts for which [he] is also liable. Moreover, that person's mental state is [his] own; [he] is liable for [his] mens rea, not the other person's." (*Ibid.*)

In the present case, the jurors were instructed pursuant to CALCRIM Nos. 520, 521 and 401, on first and second degree murder and aiding and abetting a murder. Further, they were instructed that in order to convict appellant of first degree murder, they had to find, inter alia, intent to kill and premeditation. Moreover, the court instructed the jury on reasonable doubt and informed them that "whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt."

Pursuant to CALCRIM No. 401, in order to find appellant guilty of first degree murder based on aiding and abetting that crime, the jurors had to find proven beyond a reasonable doubt that someone other than appellant (the perpetrator) committed first degree murder; appellant knew the perpetrator intended to commit first degree murder; before or during the commission of first degree murder; appellant intended to aid and abet the perpetrator *in committing first degree murder;* and appellant's words or conduct did in fact aid and abet the perpetrator's commission of first degree murder. CALCRIM No. 401 explained that appellant aided and abetted first degree murder if he knew of the perpetrator's unlawful purpose—the commission of intentional, premeditated murder— and he specifically intended to, and did in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of such murder. (See *People v. Mendoza, supra,* 18 Cal.4th at p. 1123.)

In our view, without a doubt, the instructions as a whole unmistakably required the jury to make an individual determination of appellant's mental state. CALCRIM No. 401 required the jurors to find not only that appellant knew of the perpetrator's intent to kill

27

i.e. murder the victim, but also that appellant *intended* to aid and abet the perpetrator in committing murder. Manifestly this required that the jurors consider appellant's mental state separate and apart from the perpetrator's mental state. As a practical matter, logic dictates that it would be impossible for an aider and abettor to know of another's intent to commit *murder* and decide to aid in accomplishing the murder without the aider and abettor also having the intent to kill.

To put it another way, when the offense is a specific intent offense such as murder, necessarily, the aider and abettor shares the specific intent of the perpetrator i.e. to kill when the aider and abettor knows the full extent of the perpetrator's criminal purpose—to kill the victim—and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's killing of the victim.

Certainly, CALCRIM No. 401 does not use the word "share" or explicitly state that in order for an aider and abettor to be liable for murder, he must—independently of the perpetrator—have the specific intent to kill.[17] (See *People v. Acero* (1984) 161 Cal.App.3d 217, 224–226.) However, this does not mean there exists a reasonable likelihood the jury was misled. "Implicit in the notion of someone 'sharing' another's intent is knowledge of that intent and harboring the same purpose oneself." (*People v. Williams* (1997) 16 Cal.4th 635, 676.) What matters is not the specific words used, but rather "that the jury receive an accurate description of the required state of mind. [Citation.]" (*People v. Stallworth* (2008) 164 Cal.App.4th 1079, 1104–1105.) Here the instructions conveyed that description. Since the meaning the instructions communicated to the jury was unobjectionable, "the instructions cannot be deemed erroneous. [Citation.]" (*People v. Benson* (1990) 52 Cal.3d 754, 801; accord, *People v. Dieguez* (2001) 89 Cal.App.4th 266, 276.)

---

[17] We point out that neither does the version of CALJIC No. 3.01 that has been in effect for years.

Finally, appellant claims that the instructions as given allowed the jury to convict him of aiding and abetting an implied malice murder. Appellant contends that the instructions in this case permitted the jury to find the perpetrator guilty of murder without a finding of a specific intent to kill, and the instructions did not clearly inform the jury that if that were the case, he could not be convicted of having aided and abetted the perpetrator in the absence of an instruction on the natural and probable consequences doctrine.

Appellant's theory is that the definition of implied malice murder "could readily and reasonably be applied to an assailant's pulling out a knife in the midst of an assault and stabbing the victim."

As noted, the jury received instructions encompassing first degree murder (CALCRIM No. 521) and murder based on either "express malice," that is an intent to kill, or "implied malice," that is, the perpetrator intentionally committed an act, the natural and probable consequences of which were dangerous to human life, which the perpetrator knew at the time he committed the act, and the act was performed in conscious disregard for human life. (CALCRIM No. 520.)

Before the jury retired to deliberate, the court instructed the jury in the words of CALCRIM No. 520 as follows: "The defendant is charged in Count 1 with murder in violation of Penal Code Section 187. To prove the defendant is guilty of this crime, the People must prove that, one, the defendant committed the act that caused the death of another person; and two, when the defendant acted, he had a state of mind called malice aforethought; and three he killed without lawful excuse or justification. [¶] There are two kinds of malice aforethought: express malice and implied malice. Proof of either is sufficient to establish the state of mind required for murder. The defendant acted with express malice if he unlawfully intended to kill. The defendant acted with implied malice if, one, he intentionally committed an act; two, the natural and probable consequences of the act were dangerous to human life; and, three, at the time he acted, he knew that his act

29

was dangerous to human life; and, four, he deliberately acted with conscious disregard for human life. . . . [¶] If you decide that the defendant committed murder, you must then decide whether it is murder of the first or second degree."

During deliberations the jury submitted a note to the court asking if the word "defendant" as used in CALCRIM No. 520 could be substituted with the word "perpetrator" if they were to find that appellant was "implicated" in the murder "due to aiding and abetting"; further, the jury inquired as to whether they were missing any instruction pertaining to the definition of second degree murder. The court told the jury that as to CALCRIM No. 520 the words were interchangeable in "this context."[18] The court told the jury "CALCRIM No. 520 provides for the structure of both first and second degree murder. If you determine that [1] Perpetrator caused death of another; [¶] [2] Perpetrator acted with malice aforethought; and [¶] [3] Killed without lawful excuse or justification then determine whether 1º or 2º. If 1º does not apply, but 1-3 proven, then it is 2º." A little over an hour later, the jury reached its verdict of guilty of first degree murder.

We assume for the sake of argument that the instructions given allowed the jury to improperly find aiding and abetting of an implied malice murder. Further, we assume that this issue was not invited or otherwise forfeited by appellant for purposes of appeal and that his federal constitutional rights are implicated meriting review under the harmless-beyond-a-reasonable-doubt standard of *Chapman v. California* (1967) 386 U.S. 18, 24. Moreover, even under this most stringent test of prejudice, we conclude beyond a reasonable doubt that the assumed error did not contribute to the verdict. (*People v. Chun* (2009) 45 Cal.4th 1172, 1201.)

---

[18] We are not sure what the court meant by this. It could be that pursuant to the evidence and the prosecutor's theory of the case, the court meant that the defendant and the perpetrator were one and the same. Appellant's arguments assume otherwise.

30

The problem with appellant's hypothesis is that to have found him guilty of first degree premeditated murder on the theory that he aided and abetted an implied malice murder the jury would have had to have completely disregarded CALCRIM No. 521, pursuant to which the court instructed the jury that "The *defendant* is guilty of first-degree murder if the People have proved *he* acted willfully, deliberately, and with premeditation. The *defendant* acted willfully if *he intended to kill*. The *defendant* acted deliberately if *he* carefully weighed the considerations for and against his choice and knowing the consequences decided to kill. The *defendant* acted with premeditation if *he* decided to kill before completing the acts that caused the death. . . . [¶] The People have the burden of proving beyond a reasonable doubt that the killing was first-degree murder rather than a lesser crime. If the People have not met this burden you must find the *defendant* not guilty of first degree murder." (Italics added.) "[E]xpress malice and an intent unlawfully to kill are one and the same." (*People v. Saille* (1991) 54 Cal.3d 1103, 1114, fn. omitted.)

Since the jury had no other definition of first degree murder, we must presume that the jury followed this instruction as given. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852-853; *People v. Scott* (1988) 200 Cal.App.3d 1090, 1095 [jurors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions].)

In sum, given the instructions, the evidence, and the argument of counsel, we see no reasonable likelihood the jury applied the instructions in the manner that appellant contends. Further, for the foregoing reasons, we conclude beyond a reasonable doubt that the alleged instructional error did not contribute to the verdict.

IV.    *Instruction on the Withdrawal Defense*

As part of CALCRIM No. 401—the aiding and abetting instruction—the court instructed the jury on the "withdrawal defense." Appellant contends that this was prejudicial error because there was no evidence supporting such a defense.

31

Relevant here, the court instructed the jury as follows:

"A person who aids and abets a crime is not guilty of that crime if he or she withdraws before the crime is committed. To withdraw, a person must do two things. One, he or she must notify everyone else he or she knows is involved in the commission of the crime that he or she no longer is participating. The notification must be made early enough to prevent the commission of the crime. [¶] And, two, he or she must do everything reasonably within his or her power to prevent the crime from being committed. He or she does not have to actually prevent the crime. [¶] The People have the burden of proving beyond a reasonable doubt that the defendant did not withdraw. If the People have not met this burden, you may not find the defendant guilty under aiding and abetting theory."

Again, counsel did not object to the instruction as given. Again, we conclude that appellant has forfeited this claim by failing to object to the trial court's inclusion of the language relating to the withdrawal defense in the aiding and abetting instruction. (*People v. Lee* (2011) 51 Cal.4th 620, 638.) A trial court has no sua sponte duty to revise or improve upon an accurate statement of law without a request from counsel (*People v. Kelly* (1992) 1 Cal.4th 495, 535), and failure to request clarification of an otherwise correct instruction forfeits the claim of error for purposes of appeal. (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1163.)

Nevertheless, although a defendant forfeits the right to appeal alleged errors " ' "by failing to make an appropriate objection in the trial court; . . . an appellate court may review any instruction given even though no objection was made in the lower court if the substantial rights of the defendant are affected. [Citation.] The cases equate 'substantial rights' with reversible error, i.e., did the error result in a *miscarriage of justice?* [Citations.]" [Citation.]' [Citation.]" (*People v. Christopher* (2006) 137 Cal.App.4th 418, 426-427.)

Appellant fails to make the required showing of a miscarriage of justice. Appellant claims that he was prejudiced by the instruction because it allowed the jury to find his "failure to take steps to prevent the crime as a basis for conviction." We are not persuaded because the part of CALCRIM No. 401 immediately preceding the challenged part of the instruction informed the jury that if they concluded the defendant "was present at the scene of the crime or failed to prevent the crime, [they] may consider that fact in determining whether the defendant was an aider and abettor. However, the fact that a person is present at the scene of a crime or fails to prevent a crime does not, by itself, make him or her an aider and abettor." Accordingly, the instruction prohibited the jury from finding appellant guilty in the manner that he suggests on appeal. "A defendant challenging an instruction as being subject to erroneous interpretation by the jury must demonstrate a reasonable likelihood that the jury understood the instruction in the way asserted by the defendant." (*People v. Cross* (2008) 45 Cal.4th 58, 67–68.) Appellant has failed to so demonstrate.

Appellant suggests that the instruction was irrelevant and therefore prejudicial. We have found no case holding that it is prejudicial error to instruct on a defense that is not supported by substantial evidence. The instruction could only have been to appellant's benefit because it allowed the jury to find no aiding and abetting liability and placed the burden on the People to prove the absence of the defense beyond a reasonable doubt. It was up to the jury to decide whether the defense applied. As the court instructed the jury, "Some of these instructions may not apply, depending on your findings about the facts of the case. Do not assume just because I give a particular instruction that I am suggesting anything about the facts. After you have decided what the facts are, follow the instructions that do apply to the facts as you find them." Had the jury found the instruction on the withdrawal defense inapplicable, the jury would have ignored it, not used it to appellant's detriment as he suggests. Appellant's assertion that no substantial evidence supported the instruction does not warrant our finding reversible

33

error because the jury is presumed to disregard an instruction if the jury finds the evidence does not support its application. (*People v. Olguin*, *supra*, 31 Cal.App.4th at p. 1381; *People v. Frandsen* (2011) 196 Cal.App.4th 266, 278.)

In sum, we do not find reversible error in the giving of the instruction on the withdrawal defense to aiding and abetting liability.[19]

V.      *Failure to Read CALCRIM No. 400*

Approximately two hours after the jury retired to deliberate, the court received a two-part question from the jury foreperson. The jury asked "1) Can the defendant (Ralph Garcia) be found guilty of murder under the rules of aiding and abetting even if the perpetrator (i.e. stabber) was possibly someone else? [¶] 2) Can we get a layman's definition of aiding and abetting?" After consulting with counsel, the court answered the first question "Yes" and referred the jury to CALCRIM No. 401 in answering the second question. Shortly thereafter the jury requested to be released for the evening. When the jury returned to deliberate one week later, the jury foreperson sent a second request for clarification. This time the jury asked, "What is the definition of 'perpetrator'?" After consulting with counsel, the court sent a note to the jury apologizing for not providing them with CALCRIM No 400 defining perpetrators and aiders and abettors. The court provided the jury a written copy of the instruction, but did not read the instruction to the jury. The written instruction provided the following: "A person may be guilty of a crime in two ways. One, he or she may have directly committed the crime. I will call that person the perpetrator. Two, he or she may have aided and abetted the perpetrator, who directly committed the crime. [¶] A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator."

Appellant contends that the trial court's belated provision of CALCRIM No. 400 to the jury and its failure to read the instruction to the jury was prejudicial. He asserts

[19]     We agree the instruction had no place under the facts of this case; we can find no facts that would support it.

34

that there "is no record of whether all the jurors actually reviewed the written instruction, or indeed, whether *any* of them did." Appellant cites *People v. Murillo* (1996) 47 Cal.App.4th 1104 (*Murillo*), *People v. Wilson* (2008) 44 Cal.4th 758 (*Wilson*) and *People of the Territory of Guam v. Marquez* (9th Cir. 1992) 963 F.2d 1311 (*Marquez*) in support of his argument that the error here was prejudicial.

In *Murillo*, the court failed to read an instruction it had said it would give. Defense counsel brought this omission to the court's attention. Over defense counsel's objection, the trial court "did not recall the jury and read the instruction aloud, for fear of drawing undue attention to it." (*Murillo*, *supra*, 47 Cal.App.4th at pp. 1107.) The court decided to include the instruction in the written packet sent to the jury. The instruction concerned evaluating witness credibility. (*Ibid*.) The appellate court stated that it was not possible to determine if the jurors actually read the written copy of the instruction. Accordingly, the appellate court "approach[ed] the case as though the instruction was not given at all." (*Ibid*.) However, the court still found the trial court's error harmless (*id*. at p. 1109); the court concluded that the jury was given other instructions that "cover[ed] essentially the same ground." (*Id.* at pp. 1108.)

In *Wilson*, *supra*, 44 Cal.4th 758, the jury was correctly instructed orally on torture, but the written instruction provided to the jury was technically erroneous. (*Id*. at pp. 803-804.) The Supreme Court concluded that although the written instructions contained a technical error, the error was harmless beyond a reasonable doubt under *Chapman v. California, supra,* 386 U.S. 18, 24. The Supreme Court reasoned that the court orally instructed the jury with the correct instruction and although generally the court gives priority to the written version of an instruction—when a conflict exists between the written and oral versions—the jury was not informed of this rule. Thus, it was possible the jury followed the oral instruction. Further, there is no indication the jury was aware of the slight difference between the written and oral versions of the instructions, as it asked no questions about this point. Third, the evidence was

overwhelming that defendant beat, tortured and killed and victim. (*Wilson*, *supra*, at p. 840.)

In *Marquez*, *supra*, 963 F.2d 1311, the trial court read some of the instructions, but over the defendant's objection, provided many of them in written form, including those on the elements of the crimes and their definitions. (*Id*. at pp. 1312-1313.) The court held that all the instructions should have been read to the jury and that the error in omitting instructions on the elements of the offense required reversal (*id*. at pp. 1314-1326); specifically, the court found that "the failure of a trial court to instruct the jury orally makes it impossible for an appellate court to determine from the record whether each juror was aware of the elements of each crime before the verdict was rendered." (*Id*. at p. 1312.)

We find *Murillo*, *Wilson*, and *Marquez* to be distinguishable. Here, in contrast to *Murillo,* appellant never objected to the trial court's failure to orally instruct the jury pursuant CALCRIM No. 400. Furthermore, the reasoning of *Murillo* is questionable because it ignores the presumption that the jury was guided by the written instructions, not the instructions as orally given by the court. "It is generally presumed that the jury was guided by the written instructions [given to the jury for its deliberations]. [Citation.] We indulge that presumption here." (*People v. Davis* (1995) 10 Cal.4th 463, 542.)

*Wilson* was a case of conflicting instructions where the written instruction was erroneous, not a case where an instruction was given in writing, but not read orally to the jury. Finally, as to *Marquez*, while federal circuit court decisions may be persuasive, they are not binding on state courts. (See, e.g., *People v. Camacho* (2000) 23 Cal.4th 824, 830, fn. 1; *People v. Cummings* (1974) 43 Cal.App.3d 1008, 1019.) In contrast, we are compelled to follow the decisions of our Supreme Court (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455), and those cases have consistently rejected appellant's implied position that we must assume that the jury did not read the written instructions. (See, e.g., *People v. Osband* (1996) 13 Cal.4th 622, 687; *People v.*

*Crittenden* (1994) 9 Cal.4th 83, 138-139; *People v. McLain* (1988) 46 Cal.3d 97, 111, fn. 2.)

Moreover, in the context of the jury's questions, the record shows that the jury did read the instruction, just as it had read the other instructions. The jury's next question specifically referred to CALCRIM No. 520 and asked if "perpetrator" could be substituted for "defendant." It is quite apparent that the jury was reading the written instructions provided by the court. Finally, it makes little sense to argue that the jury did not read CALCRIM No. 400 when they had specifically asked for the definition of "perpetrator" and CALCRIM No 400 provided that definition.

We note that appellant's claims of instructional error are premised on the assumption that the jury found him guilty as an aider and abettor. An overwhelming amount of evidence showed that appellant was the perpetrator. Frankly, given the evidence and the arguments of counsel, we see no way that a reasonable jury would have found appellant guilty of first degree murder on the theory that he aided and abetted the actual stabber.

In sum, we see find no prejudice in the court failing to read CALCRIM No. 400 to the jury.

VI.     *Cumulative Error*

Finally, appellant contends that even if none of the aforementioned instructional errors warrant reversing his conviction, this court should consider that result after assessing their cumulative weight.

"The concept of finding prejudice in cumulative effect, of course, is not new. Under the 'cumulative error' doctrine, errors that are individually harmless may nevertheless have a cumulative effect that is prejudicial. [Citations.]" (*In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32.)

Under some circumstances, several errors that are each harmless on their own should be viewed as prejudicial when considered together. (*People v. Hill* (1998) 17

37

Cal.4th 800, 844, overruled on a different ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.)  Since we have found none of appellant's claims of error meritorious, a cumulative error argument cannot be sustained.  No serious errors occurred, which whether viewed individually or in combination, could possibly have affected the jury's verdict.  (*People v. Martinez* (2003) 31 Cal.4th 673, 704; *People v. Valdez* (2004) 32 Cal.4th 73, 128.)  To put it another way, since we have found no substantial error in any respect, appellant's claim of cumulative prejudicial error must be rejected.  (*People v. Butler* (2009) 46 Cal.4th 847, 885.)

*Disposition*

The judgment is affirmed.

_____
ELIA, J.

WE CONCUR:

_____
RUSHING, P. J.

_____
PREMO, J.